**OLD DOMINION DAIRY PRODUCTS, INC., Appellant,**

v.

**SECRETARY OF DEFENSE et al., Appellees.**

No. 79–1821.

United States Court of Appeals, District of Columbia Circuit.

Argued June 5, 1980.

Decided July 29, 1980.

As Amended Oct. 30, 1980.

---

Charles D. Ablard, Washington, D. C., for appellant.

William J. Bowman, Asst. U. S. Atty., Washington, D. C., at the time the brief was filed with whom John A. Terry, Michael W. Farrell, Asst. U. S. Attys., Carl S. Rauh, U. S. Atty., Washington, D. C., were on brief, for appellees.

Before TAMM, ROBINSON and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge EDWARDS.

EDWARDS, Circuit Judge:

This case raises significant questions concerning the manner in which a Government agency (in this case the Department of Defense) may deal with prospective Government contractors. In 1979, appellant, Old Dominion Dairy Products, Inc. (ODDPI), was denied a substantial Government contract, for which it was low bidder, pursuant to a determination by the Government agency's contracting officer that Old Dominion "lacked integrity." At approximately the same time when appellant's bid was being rejected on the first contract, ODDPI bid for a second Government contract and was once again the low bidder.

However, based on the earlier determination that Old Dominion "lacked integrity," the contracting officer assigned to handle the second contract concluded that ODDPI had "knowingly and substantially overbilled the Government" in past dealings with the agency. As a consequence of this finding, the ODDPI bid on the second contract was also rejected for an alleged lack of responsibility and integrity.

Since the loss of the Government contract work threatened the very existence of the business, ODDPI immediately filed this suit in District Court upon being notified of the bid rejections. Old Dominion sought declaratory and injunctive relief on the grounds that (1) the agency's contracting officers had no rational basis for determining that Old Dominion lacked integrity, and (2) the agency's contracting officers denied Old Dominion due process of law, in violation of the Fifth Amendment, in determining that ODDPI lacked integrity without giving ODDPI notice of the charges against it or any opportunity to respond to those charges. For relief, Old Dominion sought cancellation of the two contracts awarded to other contractors, new awards of those contracts to ODDPI, and a declaration that Old Dominion did not lack integrity.

Following a three-day evidentiary hearing on the merits, the Honorable Gerhard A. Gesell, District Judge, rejected Old Dominion's claims and entered judgment for the Government. *Old Dominion Dairy Products, Inc. v. Brown*, 471 F.Supp. 300 (D.D.C.1979). Old Dominion then brought this appeal, again claiming that the contracting officers lacked a rational basis for their decisions and that, in any event, ODDPI had been denied due process of law.

We are mindful of the fact that Government agencies require sufficient latitude to ensure the efficient functioning of agency operations, and that the imposition of stringent due process requirements on every governmental decision could have devastating effects on the conduct of Government business. Nevertheless, we hold that when the Government effectively bars a contractor from virtually all Government work due

to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I.

Old Dominion Dairy Products, Inc. is a small business owned primarily by its President, Joel M. Turner, and his family (Tr. 134).[1] Old Dominion manufactures and processes dairy products in various countries throughout the world. Almost one hundred percent of the ODDPI operation is directed at obtaining Government contracts to supply dairy products to United States military bases overseas (Tr. 134).

Beginning in 1970, ODDPI performed contracts on Government bases in Taiwan, Cuba, Spain, Okinawa, Korea and Puerto Rico. App. D, exhibit 1.[2] The gross sales on these contracts totalled over thirty million dollars. App. D, exhibit 1. Prior to the present controversy, no serious problems had existed in the performance of any of the ODDPI contracts. Old Dominion was regularly solicited by the Government to bid on overseas milk contracts; no claim or determination had ever before been made challenging ODDPI's responsibility or

integrity as a Government contractor (Tr. 135–136).

### A. The Okinawa Contract

On April 8, 1974, the Government awarded ODDPI a contract (hereinafter contract 5016) to deliver milk products on the island of Okinawa (Tr. 25). The contract had an original term of one year, with provisions for annual one-year renewals for a total of four years.[3] The contract was set to finally expire on June 30, 1979.[4]

In October of 1978, the Pacific Air Force (PACAF) Contracting Center on Okinawa requested an audit of ODDPI's home office in Virginia Beach, Virginia.[5] An audit was conducted by the Defense Contract Audit Agency (DCAA) beginning in late January 1979 (Tr. 186). In February of 1979, the contract price analyst at the PACAF Contracting Center in Okinawa, Ms. Rita L. Wells, was sent to assist with the audit of the ODDPI home office (Tr. 186).

Following the compilation of the audit data, Ms. Wells prepared a report analyzing and evaluating the information obtained. App. F, exhibit 5, item 2. The report noted three "irregularities" in the performance of contract 5016. Each one of the alleged irregularities involved what later proved to be seriously disputed interpretations of certain complex provisions in the contract between ODDPI and the Government.[6] Ms.

1. "Tr." refers to the transcript of the proceedings before Judge Gesell of the District Court, held April 30 through May 2, 1979.

2. "App." references are to the joint appendix submitted by the parties. Items within the joint appendix are designated by lettered tabs.

3. A dispute arose as to whether the contract provided for four one-year renewals, or a total contract life of four years. The Government attempted to renew the contract for the fifth year, and ODDPI performed under protest. The resolution of this dispute was pending before the Armed Services Board of Contract Appeals at the time of the trial before Judge Gesell (Tr. 137).

4. Over this period, the contract was administered by six different contracting officers (Tr. 28). Under the first four contracting officers, all contract disputes were settled at the contracting officer level. However, following the

appointment of the fifth contracting officer in April of 1977, five disputes arose under the contract. These disputes were pending before the Armed Services Board of Contract Appeals at the time of the trial before Judge Gesell (Tr. 31).

5. The audit apparently originated because Old Dominion claimed to be in a "loss position" on the Okinawa contract (Tr. 185). In response to this claim, the PACAF Contracting Center on Okinawa reviewed the financial records of ODDPI's plant on Okinawa. Because of the findings on this review, the Contracting Center requested an audit of the home office (Tr. 185).

6. Ms. Wells made three findings: (1) a discrepancy existed between the price adjustment claims made by ODDPI (under a provision of the contract designed to compensate ODDPI for fluctuations in raw material prices) and actual production formulas used, resulting in

Wells concluded that the alleged "irregularities indicate an unsatisfactory record of integrity." App. F, exhibit 5, item 2, p. 1. More specifically, Ms. Wells stated in the report that these discrepancies "show a lack of business integrity. The only reason the contractor would have for the above discrepancies would be to recoup undue monies under the contract." App. F, exhibit 5, item 2, p. 4.

In light of the impending termination of contract 5016 on June 30, 1979, in November of 1978 the PACAF Contracting Center in Okinawa solicited bids for a new contract to run for three years beginning July 1, 1979 (Tr. 138). Old Dominion was one of nine contractors solicited and, in January of 1979, ODDPI submitted an initial price proposal (Tr. 141). Two other bidders responded to the solicitation (Tr. 239). Following receipt of the initial proposals, negotiations were scheduled with each contractor. Negotiations with ODDPI were scheduled for March 19–21, 1979 (Tr. 143). Final bids were due on March 26, 1979 (Tr. 153).

Senior Master Sergeant Juan B. Trevino was chosen as contracting officer for the new Okinawa milk contract (Tr. 239). In order to fulfill his duty under applicable regulations to award a contract only to a contractor whom he determined to be "responsible," [7] Sergeant Trevino requested information on ODDPI's performance under the old contract from the administrative contracting officer, Mr. Fred Artibee (Tr. 241).[8] On March 21, 1979, Mr. Artibee provided Sergeant Trevino with a copy of Ms. Wells' audit report (Tr. 242). Sergeant Trevino reviewed the report and concluded that Old Dominion was not dealing honestly with the Government and was "fraudulently receiving undue profits under the current contract" (Tr. 247, 249). On that same day, a determination was made that ODDPI lacked integrity within the meaning of Defense Acquisition Regulation 1–903.1 (32 C.F.R. 1–903.1) and was thus not "responsible." *See* App. G, exhibit 6, item 2. Although Sergeant Trevino had a number of telephone conversations with Old Dominion executives between March 21 and March 26, *he did not at any point notify Old Dominion of the charges against it or indicate that the responsibility of ODDPI was in question* (Tr. 253–254).

On March 26, 1979, best and final offers were submitted by ODDPI and two other contractors. Old Dominion's final proposed price was $8,746,378 (Tr. 147). On that day, Trevino placed a written determination of nonresponsibility, with supporting documents (including the audit report), in the contract file (Tr. 243; App. F). On the following day, Trevino awarded the contract to Foremost Blue Seals, a Japanese contractor, for 2,085,167,081 yen (Tr. 147,

extra money paid to ODDPI through substitution of cheaper ingredients; (2) ODDPI had substituted used wire milk cases for the new cases contemplated by the contract; and (3) ODDPI had misrepresented price quotations for vegetable fat by quoting the price of one manufacturer but actually purchasing products from another manufacturer at a generally lower price. App. F, item 2. Old Dominion introduced substantial testimony at trial in support of these actions. For instance, evidence was introduced that the contract allowed for adjustment in the contract price due to fluctuation in the market prices of certain goods, without explicitly requiring that a specified amount of those goods be used (Tr. 36–43). Concerning the wire crates, although used wire cases were apparently "rented" to the Government at new milk case prices, that same amount was credited to the Government when the cases were returned (Tr. 55–57). Finally concerning the price quotations, evidence was submitted that the contract clearly did not require ODDPI to purchase products at the price quoted; price quotations for vegetable fat were *not* "invoice" prices (Tr. 39, 116–123). Although the District Court did not resolve any of these issues of contract interpretation, and neither do we, it appears that the foundation of Ms. Wells' report was that Old Dominion had advantageously used a poorly drawn or ambiguous contract.

7. Defense Acquisition Regulation (DAR) 1–904.1 (32 C.F.R. 1–904.1 (1979)) states that "no purchase shall be made from, and no contract shall be awarded to, any person or firm unless the contracting officer first makes an affirmative determination that the prospective contractor is responsible within the meaning of 1–902."

8. Sergeant Trevino requested similar information with respect to the other two contractors submitting initial proposals (Tr. 242).

251; App. D, exhibit 6). At the dollar/yen ratio quoted for March 28, 1979, the contract award to Foremost was for $10,122,169, or approximately $1,375,000 higher than ODDPI's best and final offer. App. D, exhibit 11.

Upon receiving notice that it had been denied the contract, Old Dominion requested a statement of reasons for the determination of nonresponsibility, a cancellation of the award to Foremost, an award of the contract to ODDPI, and removal of the determination of nonresponsibility from the contract file. App. D, exhibit 7. Sergeant Trevino responded simply that the finding of nonresponsibility was based on the lack of a "satisfactory record of integrity." He refused to cancel the award to Foremost, and stated that "since a determination of nonresponsibility is required to be maintained in the file, removal of that determination is not possible." App. D, exhibit 8.

In so doing, Sergeant Trevino admitted that, but for the determination of nonresponsibility, Old Dominion would have otherwise received the contract. Defense Acquisition Regulation 1–904.1 (32 C.F.R. 1–904.1) provides that "when a bid or offer *on which an award would otherwise be made* is rejected because the prospective contractor is found to be nonresponsible, a determination of nonresponsibility shall be made, signed, and placed in the file" (emphasis supplied). More importantly, the Government has never denied that, but for the determination that Old Dominion lacked integrity, ODDPI would have otherwise received the contract. No other reason has ever been suggested.

### B. *The Yokohama Contract*

Simultaneous with the negotiations for the Okinawa contract, a similar milk contract became available for military installations in Yokohama, Japan. On December 18, 1978, the PACAF Contracting Center in Yokohama solicited bids for the supply of dairy products (Tr. 277). As with the Okinawa contract, best and final offers were due on March 26, 1979 (Tr. 278). The proposed contract was for one year beginning July 1, 1979, with four one-year renewal options (Tr. 159). The contracting officer in charge of negotiations was William P. Barrett (Tr. 160, 277).

Old Dominion was again one of three contractors to submit initial bids (Tr. 277). In anticipation of a possible award to ODDPI, Barrett sent two letters requesting performance data on Old Dominion's two existing contracts at Okinawa and Korea (Tr. 278). The report from Korea indicated that performance was "a least satisfactory;" a reference was also made to the fact that an audit was currently being conducted of Old Dominion by DCAA (Tr. 278).

On March 21, 1979, Barrett received an electronic report from Colonel Damm, Chief of the PACAF Contracting Center on Okinawa (Tr. 286–287). The report from Colonel Damm began with the following statement: "Under the provisions of DAR 1–902 a determination is hereby made that Old Dominion Dairy Products is not a responsible contractor for failing to meet the DAR 1–903.1(iv) requirement wherein a prospective contractor to be declared responsible must meet the minimum standard of having a satisfactory record of integrity." App. G, exhibit 6, item 2. Transmitted after this opening statement was a copy of Ms. Wells' report. App. G, exhibit 6, item 2.

Based on this communication, Mr. Barrett concluded that Old Dominion had "knowingly and substantially overbilled the Government" (Tr. 279). Barrett based this conclusion solely on the communication from Colonel Damm and the report of Ms. Wells (Tr. 288). *At no point between March 21 and March 26 did Barrett inform ODDPI of the allegations in the report, or notify Old Dominion that its integrity was in issue* (Tr. 163).

On March 26, 1979, Old Dominion submitted a best and final offer for the Yokohama contract of $1,161,388.98. App. D, exhibit 12. On that date, however, Mr. Barrett made a determination that ODDPI was a nonresponsible contractor due to a lack of a satisfactory record of integrity, and placed that determination and the March 21 report from Okinawa in the con-

tract file. App. G. The contract was awarded to Servrite International, the next low bidder, at a price of $1,272,873.43. App. D, exhibit 13.[9]

As with the Okinawa contract, the record here is clear that, but for the finding of a lack of integrity, Old Dominion would have otherwise received the Yokohama contract. The Government has never suggested that any other reason motivated the award to Servrite, a substantially higher bidder.

## C. *The District Court Proceedings*

Faced with a total loss of its primary source of business, Old Dominion filed suit in the United States District Court on April 6, 1979, seeking declaratory and injunctive relief. Old Dominion claimed that there was no basis for the finding of a lack of integrity, and that Old Dominion was therefore entitled to receive the two disputed contract awards. In addition, ODDPI alleged that the manner in which the Government rejected its two bids had denied Old Dominion due process of law. On April 11, the District Court heard and denied ODDPI's motion for a temporary restraining order. A hearing on Old Dominion's motion for a preliminary injunction was scheduled for April 30, 1979.

On the morning of April 30, Old Dominion was notified in court that it was formally suspended under Defense Acquisition Regulation 1–605 (32 C.F.R. 1–605) from bidding on contracts with the Department of Defense.[10] A three-day evidentiary hearing was then conducted on ODDPI's motion. Following the presentation of evidence, the parties agreed to submit the case for final determination on the merits. On May 2, 1979, the District Court took the case under advisement.

In a six-page Memorandum Opinion, the Honorable Gerhard A. Gesell entered judgment for the Government on May 14, 1979. 471 F.Supp. 300. The court noted that a contracting officer "enjoys a very wide range of discretion" in determining whether a contractor is responsible, and concluded that the audit report "provided ample basis for the rejections which were thus clearly reasonable under all the circumstances." *Id.* at 302–303. The court also summarily concluded that ODDPI's due process claim was "without merit." [11] The court emphasized that this was particularly true in view of the initiation of proceedings under the suspension regulations which, the court noted, "will provide plaintiff with an 'opportunity to clear [its] name.'" *Id.* at 303.[12] As a result of these conclusions, the court rejected Old Dominion's request for injunctive or declaratory relief and dismissed the complaint.

Although technically not a part of the District Court proceeding, on May 25, 1979, Old Dominion's request for a hearing under the suspension regulations was denied. Addenda to appellant's brief, item 4.[13] With

**9.** The contract to Servrite was thus approximately $111,000 higher than Old Dominion's final offer.

**10.** The suspension regulations provide that the contractor must be given notice of the suspension, which must include a description "in general terms" of the nature of the irregularities giving rise to the suspension (DAR 1–605.3). A suspension is effective for 12 months, but may be continued for an additional 6 months at the request of the Department of Justice (DAR 1–605.2). Although a *request* for a hearing may be made (DAR 1–605.3), that request may be denied if a hearing would "adversely affect possible civil or criminal prosecution." (DAR 1–605.2). If the request for a hearing is denied, however, any information or argument in opposition to the suspension may be presented in person, in writing, or through representation (DAR 1–605.2).

**11.** The court cited that portion of *Board of Regents v. Roth*, 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972), wherein the Supreme Court held that a nontenured public university professor did not possess a "property" interest in re-employment sufficient to require university officials to give him a hearing when the university declined to renew his contract of employment.

**12.** The District Court noted that any attack on the sufficiency of the suspension proceedings was "most certainly premature." 471 F.Supp. at 303.

**13.** The Government admits that after the decision of the District Court, ODDPI's request for a hearing was denied. Appellee's brief, fn. 18. The Government does note that at the time the hearing was denied, ODDPI was notified of its

these facts in mind, we turn to consider appellant's claims.

## II.

Appellant's first argument on appeal is that the District Court erred in holding that the contracting officers had a rational basis for determining that Old Dominion lacked integrity. On the basis of the record presented in this case, we agree with the District Court that a reasonable basis did exist.

Appellant concedes that the standard of review with respect to decisions made by the contracting officers is very narrow. As stated in *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203 (Ct.Cl.1974), the ultimate standard is "whether the Government's conduct was arbitrary and capricious toward the bidder-claimant." Concerning a determination of nonresponsibility, the court in *Keco Industries* specifically stated that contracting officers "have very wide discretion," and that a complaining bidder "would normally have to demonstrate bad faith or lack of any reasonable basis in order to prevail." *Id.* at 1205. In describing the reasonable basis test, the court elsewhere noted that, "although based on external facts and circumstances rather than a showing of animosity toward plaintiff or favoritism for a competitor, this principle is not far removed from the bad faith test; courts often equate wholly unreasonable action with conduct motivated by subjective bad faith." *Id.* at 1204.

In the present case, there are no grounds for overturning the careful decision of the District Court, made after hearing three full days of testimony, that a reasonable basis did exist to justify the actions of the contracting officers. Appellant has never alleged any bad faith on the part of the contracting officers. Nor can it be said that the officers acted arbitrarily. Pursuant to existing regulations, the contracting officers solicited information from military bases at which appellant was currently providing services in an effort to determine whether ODDPI would be a responsible contractor on the new contracts. Each officer determined ODDPI to be nonresponsible on the basis of a detailed audit report which *raised the possibility* that Old Dominion had violated the terms of an existing contract and overcharged the Government. On these facts, the District Judge properly found that the contracting officers had a reasoned basis upon which to act.

## III.

Appellant's second argument on appeal is that the District Court erred in holding that ODDPI did not have a due process right to notice of the charges of a lack of integrity and of at least a minimal opportunity to respond to those charges before being denied the Government contracts. Appellant raises a difficult and novel question of law, which must be considered in light of the interests of all parties involved.

As stated at the outset, Officer Trevino received Ms. Wells' report on March 21, 1979. On that same day, the report was transmitted to Mr. Barrett at Yokohama. During the five remaining days before the deadline for best and final offers, numerous discussions were held between the Government and Old Dominion. In none of those discussions was any reference ever made to the fact that Old Dominion had been determined to be nonresponsible for lack of integrity. No notice of any kind was ever given to Old Dominion that its responsibility was even in issue.[14] Moreover, this was not a case where denial of one contract at least gave the contractor "constructive" notice of the allegations against it; appellant in this case was denied a second contract before it received any notice of the denial

right to present any information or argument in opposition to the suspension in person, in writing, or through representation. *See* addenda to appellant's brief, item 4.

14. Old Dominion was of course aware of the fact that an audit had been conducted on the books of the company (Tr. 165). The record does not disclose, however, that they had been notified of the reason for the audit or informed of its results.

on the first contract.[15] In the present case, a determination that Old Dominion lacked integrity was made and communicated through Government channels without ODDPI having any notice that the determination had been made. This failure of notice persisted even though negotiations and conversations were conducted between Government officials and ODDPI executives during a period of five days before adverse action was taken against ODDPI on the basis of a lack of integrity.

Appellant contends that in so acting the Government deprived ODDPI of due process of law in violation of the Fifth Amendment.[16] Old Dominion does *not* claim to have had a "property" interest in the contract awards. Rather, appellant claims that a "liberty" interest was violated, i. e. a right to be free from stigmatizing governmental defamation having an immediate and tangible effect on its ability to do business.

In addition, appellant does not contend that due process requires a formal hearing before determination of a lack of integrity may be made. Appellant claims only a right to be *notified* of the allegations against its integrity, and an opportunity to

immediately present, in whatever time is available, facts and arguments to persuade the contracting officer that the allegations lack merit. Appellant argues that such notice and a minimal chance to respond will at least allow it an opportunity to preserve contract awards which, but for the allegations of lack of integrity, would otherwise have been made to the contractor.[17]

The Government presents three arguments in opposition to appellant's due process claim. First, the Government asserts that a corporation may not possess a due process liberty right. Second, the Government claims that even if such a right may exist, appellant's allegations fall far short of demonstrating any injury to a cognizable liberty interest in this case. Finally, the Government argues that if a due process liberty right does apply to Old Dominion in this situation, the suspension regulations provide sufficient due process protection. We consider each of these contentions in turn.

A. *Existence of a Corporate "Liberty" Interest*

The Government's first claim, that a corporation may not possess a due process lib-

---

**15.** We therefore need not address the situation in which the contractor had in fact received constructive notice of the *actual charges* against him before communication of an agency determination that the contractor lacked integrity.

**16.** The Fifth Amendment provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law." U.S.Const. Amend. V.

**17.** Appellant renewed in oral argument a claim that it had made in the District Court that the Government conduct in this case amounted to a *de facto* debarment of ODDPI from all Government business. In support of this claim, appellant cited for the first time in rebuttal in oral argument *Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252 (2d Cir. 1975) and *Art-Metal-USA, Inc. v. Solomon*, 473 F.Supp. 1 (D.D.C.1978).

Comparing the facts of the present case with the facts in *Myers & Myers* and *Art-Metal*, it is clear that appellant's claim of *de facto* debarment is not frivolous. This is particularly true in light of the Government's assertion in oral

argument that this case would be no different if ODDPI had been denied eight successive contracts instead of just two.

We think that the question of whether or not there was a *de facto* debarment is inappropriate for consideration in this case. Presumably, if we were to find a *de facto* debarment, it would be for the purpose of considering whether the procedures surrounding the actions giving rise to the *de facto* debarment were in compliance with governing debarment regulations and, if so, whether those regulations satisfied minimum constitutional requirements. However, appellant has neither briefed nor argued in this court either of those two issues. Indeed, appellant has consistently asserted that the belated institution of suspension proceedings did not affect its claim that it had a right to notice before a determination of nonresponsibility for lack of integrity was made and the denial of the two contract awards was effectuated. Therefore, we are constrained to limit our focus to the issues originally submitted to the court on this appeal.

erty interest, is without merit.[18] The definition of liberty under the Fifth or Fourteenth Amendments has never been stated with exactness. Nevertheless, it is clear that the concept encompasses more than mere freedom from bodily restraint, and includes "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Admittedly, a corporation may not be bodily seized. Nor may it marry or bring up children. But a corporation may contract and may engage in the common occupations of life, and should be afforded no lesser protection under the Constitution than an individual to engage in such pursuits.[19]

■ The Government would limit a corporation to due process rights founded on "property" interests. Appellee's brief, p. 15–16. Chief Justice Burger, however, while still a member of this court, made clear in *Gonzalez v. Freeman*, 334 F.2d 570 (D.C.Cir.1964), that it is not the *entitlement* to a Government contract which gives a Government contractor standing to challenge the procedures by which that contrac-

tor is barred from Government business. Considering the right of (among others) the "Thos. P. Gonzalez Corporation" to challenge a debarment from Government contracts on due process grounds, the Chief Justice stated:

> Thus to say that there is no "right" to government contracts does not resolve the question of justiciability. Of course there is no such *right*; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.

(emphasis in original).[20] *Id.* at 574. Similarly, we hold that Old Dominion is entitled to challenge the Government actions in this case on due process grounds, notwithstanding the fact that ODDPI had no "property" interest in the contract awards.[21]

### B. *Presence of Injury to a Cognizable Liberty Interest in This Case*

The most difficult question presented here is whether the Government conduct injured a cognizable liberty interest in this case. We hold that it did.

Appellant claims in essence that ODDPI has a right to be free from "stigmatizing" governmental defamation having an imme-

---

**18.** The Government did not raise or pursue the matter in oral argument. Nevertheless, we briefly address the issue here.

**19.** The Supreme Court established long ago that, while a corporation was not a "citizen" within the meaning of the privileges and immunities clause, "a corporation is a 'person' within the meaning of the equal protection and due process of law clauses." *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 447, 80 L.Ed. 660 (1936). In so doing, the Court rejected an argument that "the liberty guaranteed by the Fourteenth Amendment against deprivation without due process of law is the liberty of *natural* not of artificial persons." *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 780 n.16, 98 S.Ct. 1407, 1418, n.16, 55 L.Ed.2d 707 (1978) (emphasis in original).

**20.** Similarly, in *Southern Mutual Help Ass'n, Inc. v. Califano*, 574 F.2d 518 (D.C. Cir. 1977),

the court found that a nonprofit organization had standing to contest a denial by the Department of Health, Education and Welfare (HEW) to renew a grant to the organization, because of the injury to the organization's reputation and ability to receive future grants which would result from the fact that HEW had refused to renew the grant. The court never reached the question whether the organization was actually entitled to a *hearing* on due process grounds, since it held that a hearing was required under HEW regulations.

**21.** Appellant notes that the protected "liberty" interests of a corporation may be somewhat different in scope than those of a natural person. Reply brief, p. 5. The important question is thus whether a liberty interest is implicated in this case, the question to which we now turn.

plaintiff, like the importer in *Proctor*, initially treated the letters otherwise than as section 514 protests does not bar it from now contending that they are protests. This is particularly true when it is considered that each of plaintiff's letters contain all the required elements of a protest. Not only were the letters filed within 60 days after the dates of liquidation of the entries involved, they set forth the following details: the entry numbers; the dates of entry; the dates of liquidation; the category of merchandise; the provision of the tariff schedules under which the merchandise was classified; a citation to the case of Mattel, Inc. v. United States, C.D. 3531, which held the merchandise classifiable under item 790.70 as "wigs"; the provision under which the merchandise was claimed classifiable; and the rates of duty applicable to the conflicting provisions. In sum, as previously indicated, the letters (written by a nonprofessional employee of the importer) left no doubt as to the nature of plaintiff's objection to the district director's liquidation of the entries in question, namely that the district director erred in assessing the imported doll wigs under item 737.90 at 35% ad valorem and that they should have been assessed at 14% ad valorem under item 790.70 in accordance with the decision of this court in C.D. 3531. Since the letters clearly set forth the claim of the importer and were filed within the time required by section 514, they should have been treated as protests by the local customs officials. As stated in The George C. Whitney Co. v. United States, 16 Ct.Cust.Appls. 301, 303, T.D. 42874 (1928):

> The statute requiring a protest on the part of importers was not designed for men learned in the law and trained to the niceties in pleading but for men engaged in commercial pursuits. Strict rules of construction are not applicable to protests, and it is sufficient if the importer indicates distinctly and definitely the sources of his complaint and his desire to make it the foundation of a claim against the Government. * * *

■ Nor is the result altered by the fact that the letters here were ostensibly treated by the district director as section 520(c) requests, whereas those in *Proctor* were returned as section 514 protests. The test for determining the sufficiency of a protest under section 514, as outlined above, is an objective one and is not dependent upon the district director's subjective reaction thereto. Moreover, it is interesting to note that while the letters of the district director's supervising liquidator to plaintiff denying the latter's claims stated that the claims were reviewed under section 520(c), the letters went on to state that the claims were disallowed because (1) the liquidated classification was correct; and (2) the Commissioner's ruling in T.D. 69–2 limited C.D. 3531, to the specific importation there involved. In other words, the district director denied the claims on the merits, rather than on the basis that section 520(c) was not applicable to correct an alleged erroneous classification of merchandise. Cf. e. g., United China & Glass Co. v. United States, *supra*, 66 Cust.Ct. at 209. From this, it would seem that in substance—although not in form—the district director in actuality treated plaintiff's "sec. 520(c) request letters" as section 514 protests.

■ In conclusion, the court finds that the letters of request constituted timely protests within the meaning of section 514, and that the protests against the district director's refusal to reliquidate the entries in accordance therewith were timely filed. Inasmuch as the merchandise consists of wigs for dolls the same in all material respects as those involved in C.D. 3531 which were held to be properly classifiable as "wigs" under item 790.70, plaintiff must prevail in its stated second cause of action. Therefore, plaintiff's motion for judgment on the pleadings is granted and defendant's motion for summary judgment is denied. The district director at the port of Los Angeles is directed to reliquidate the entries accordingly.