**LESLIE AND ELLIOTT CO., INC., Plaintiff,**

v.

**Honorable H. Lawrence GARRETT, III Secretary of the Navy, et al., Defendants.**

**Civ. A. No. 89–2865.**

United States District Court, District of Columbia.

Feb. 12, 1990.

Douglas L. Patin, Washington, D.C., for plaintiff.

Assistant U.S. Atty. Geoffrey A. Drucker, Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

The plaintiff filed this action on October 17, 1989, in which it asked for a temporary restraining order, preliminary injunction, permanent injunction, declaratory judgment and other relief. Plaintiff asserted that it filed the action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Plaintiff is a disappointed bidder under Department of the Navy's invitation for bids (IFB) Nos. N62472–89–B–3436 and N62472–89–B–3378. The subject solicitations concerned construction work to be performed at the United States Naval Base in Groton, Connecticut.

The case is now before the Court on the plaintiff's motion for a preliminary injunction [1].

After giving careful consideration to the motion for preliminary injunction and the opposition thereto, together with the arguments of counsel and the record in this case, the Court concludes that plaintiff's motion for preliminary injunction should be denied as moot, but that a permanent injunction should be entered. The Court further concludes that the hearing on the motion for preliminary injunction should be combined with the hearing on the merits and that the Court should enter a final order in this case. *See* Fed.R.Civ.P.

---

1. Plaintiff filed a motion for a temporary restraining order subsequent to consideration of this matter by the General Accounting Office (GAO) and that motion was granted on February 2, 1990, solely for the purpose of maintaining the status quo until such time as the Court had an opportunity to receive the defendants' opposition, if any, to the motion for a temporary restraining order, and review those papers submitted by the Government. The order granting the temporary restraining order maintaining the status quo was entered on February 2, 1990 at 4:57 p.m. The defendants' opposition thereto was received by the Court at approximately 6:00 p.m. that same day. The parties have consented to the Court treating the argument held on February 7, 1990, as an argument on plaintiff's motion for preliminary injunction. *See* Fed.R. Civ.P. 65. Since it appears that all of the necessary papers are before the Court, and the parties have had a full opportunity to brief and argue the somewhat limited issue before the Court, (and with the parties' consent) the Court concludes that the motion for preliminary injunction should be consolidated with a hearing on the merits. *See* Fed.R.Civ.P. 65(a)(2). Therefore, the order entered is a final order dispositive of the issues in this case.

65(a)(2). The Court further concludes that judgment should be entered for the plaintiff and the case returned to the agency with the direction that it conduct debarment proceedings.

## I

Very briefly, the underlying facts are as follows: IFB No. N62472–89–B–3436 was issued by the defendant Department of the Navy (Navy) on or about July 19, 1989, and requested sealed competitive bids to undertake the demolition of a training tank, Building 70. IFB No. N62472–89–B–3378 was issued by the defendant Navy on June 15, 1989 and requested sealed competitive bids to construct the ball field jogging path, Navy Submarine Base. These IFB's were restricted to bidders who are small business concerns and required that sealed bids be submitted in accordance with requirements of the IFB, the Armed Services Procurement Act, 10 U.S.C. § 2305 and the Federal Acquisitions Regulations, 48 CFR, Chapter 1, Part 14. Complaint paragraph 6. Plaintiff submitted a bid of $22,850 for IFB N62472–89–B–3378, hereinafter sometimes referred to as the construction contract, on July 27, 1989. The next low bid on that contract was $23,750. Plaintiff also submitted a bid of $255,444 on IFB No. 62472–89–B–3436, hereinafter sometimes referred to as the demolition contract, on August 24, 1989. The next low bid on that contract was $351,000. Complaint paragraph 7.

On or about August 14, 1989, plaintiff received a letter from the Small Business Administration (SBA) informing plaintiff that the Navy proposed to reject its bid on IFB N62472–89–B–3378 as not responsive for capacity but plaintiff was given the opportunity to apply for a Certificate of Competency (COC) from the SBA. Plaintiff did so by letter dated August 19, 1989. Complaint paragraph 8. On August 29, 1989, plaintiff was sent a letter from the SBA informing the plaintiff that the Navy proposed to reject its bid on the demolition contract as nonresponsive for capacity. The letter stated among other things that "Leslie and Elliott has become an administrative burden requiring the office to spend in (sic) inordinate amount of time responding to extraneous issues raised by Leslie and Elliott in over eighty letters." Complaint paragraph 9, Complaint Exhibit 3. Plaintiff was given an opportunity to apply for a COC from SBA and plaintiff did so by letter dated September 5, 1989.

On September 25, 1989, the SBA sent two letters (Complaint Exhibits 5 and 6) to plaintiff, one for each solicitation, informing plaintiff that the SBA had "found no sufficient reason for disagreeing with the decision of the procuring agency." Complaint paragraph 10. The justification by SBA for its action was that the plaintiff had three contracts where its performance had been classified as unsatisfactory and the Navy intended to issue unsatisfactory ratings on two other contracts. *Id.* Plaintiff notes that it had received written notice of only one unsatisfactory rating to date for any of the last five contracts it has performed. Plaintiff also notes that in the past three years the Navy has expressed "great irritation and dissatisfaction" with plaintiff over claims that plaintiff has submitted on contracts performed at the Groton Base. Complaint paragraph 10.

Plaintiff received the SBA letters dated September 25, 1989 on September 28, 1989, and on that same date plaintiff filed a bid protest with the General Accounting Office (GAO). Complaint paragraph 7, Complaint Exhibits 7 and 8. On or about September 29, 1989, plaintiff was advised that the Navy had already proceeded to award the two subject solicitations to other bidders. Since plaintiff's GAO protests was filed within ten calendar days of the date of the award made by the Navy, performance of the two contracts was automatically stayed pending the protest pursuant to 31 U.S.C. § 3553(d) and 4 CFR § 21.4(b). *Id.* Plaintiff notes that GAO has ninety working days from the date the protest is filed to render a decision. Plaintiff filed this action on October 17, 1989.

The Court heard arguments on plaintiff's original motion for a temporary restraining order on October 18, 1989, and thereafter noted that if GAO issued a decision adverse

to plaintiff with respect to either contract, the automatic stay authorized under the statute (31 U.S.C. § 3553) would remain in effect for five business days after plaintiff is served with a copy of the decision during which plaintiff may apply for a temporary restraining order from the court. The Court further noted, based upon the representations of counsel at the argument, that the Navy would not override the automatic stay that is currently in effect. Based upon these facts the Court denied plaintiff's motion for a temporary restraining order, directed that the matter be referred to GAO pursuant to 4 CFR § 21.9 for a decision without any change to the schedule required by statute, directed that the plaintiff file a brief in support of its request for expedited discovery and stayed all matters in the litigation subject to further orders of the Court. *See* Order filed October 24, 1989. The Court thereafter granted plaintiff's motion for leave to conduct expedited discovery with a proviso that discovery was to be completed on or before November 10, 1989. *See* Order filed November 3, 1989. Discovery was extended pursuant to a joint motion of the parties with a provision that all discovery was to be completed on or before November 15, 1989. *See* Order filed November 21, 1989, *nunc pro tunc.* By letter dated January 24, 1990, the General Counsel of the GAO submitted to the Court the Decision of GAO regarding the two administrative matters submitted to that agency by the plaintiff. In that Decision GAO denied plaintiff's protests. Plaintiff then moved for a temporary restraining order and the Court granted that motion in order to allow the Court to consider the pleading filed by the defendants and to maintain the status quo until such time as the Court had an opportunity to consider the matter in full. *See* Order filed February 2, 1990. Thereafter, defendants filed their opposition to the motion together with the record in the proceedings before the Navy, the SBA and the GAO.

Plaintiff contends that it has been the victim of a de facto debarment, and further contends that the Navy is biased against the plaintiff and that the SBA review was flawed. Plaintiff also contends that the Court is not bound by GAO's decision and that the GAO did not consider all relevant matters.

## II

A disappointed bidder who seeks review of a contract award under the APA has the burden of demonstrating that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). Such a plaintiff bears a "heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii Limited v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973).

Here, the plaintiff makes three arguments. First, it argues that it is the victim of a *de facto* debarment by the Navy in that the Navy has attacked plaintiff's integrity and has developed a policy to declare plaintiff nonresponsible on all contracts. Second, plaintiff argues that the Navy has a bias against the plaintiff. Third, it argues that the review by the SBA was flawed. Because the Court determines that this has been a *de facto* debarment by the Navy, it need not address the remaining issues.

The plaintiff contends that the Navy has debarred it from receiving contracts at the Groton facility. The Navy contends that debarment was not an issue and that it did no more than to find the plaintiff nonresponsible on the two contracts. The Navy argues that a *de facto* debarment has not been established because the nonresponsibility determination relates to the two pending contracts only and does not extend beyond the present procurement. Defendants note that the facts in *Art–Metal–USA, Inc. v. Solomon,* 473 F.Supp. 1, 5 (D.D.C.1978), are distinguishable from those here since in *Art–Metal* the defendants "candidly state[d] that they [had] no

intention of awarding these or other contracts to Art Metal as long as that company [was] being investigated." Defendants observe that the Navy has made no such representation regarding the plaintiff.

While it is true that a statement that the agency will not award a contract to the disappointed bidder in the future will support a claim of *de facto* debarment, the Court can also find *de facto* debarment based upon the conduct of the agency. In the instant case, Theodore R. Powell, a construction representative who has been with the Navy since 1986, testified that his primary role is to inspect the jobs to ensure compliance with specifications. Motion Exhibit 7, Powell Dep. at 5. He noted that he had never before been involved with a Leslie & Elliott contract, *id* at 6, and that in the course of inspections he would give approximately 50 noncompliance notices on contracts involving other companies, *id* at 15. The Navy makes much of the fact that approximately 100 noncompliance notices had been given to the plaintiff on the so-called "waterfront" contract that plaintiff was working on at or about the time it submitted the subject bids in this case. While the number of noncompliance notices given to the plaintiff by Powell amounted to twice the number he normally gives, Powell was assigned to remain with plaintiff during the course of its work on the waterfront project, while such was not the case when he was inspecting other contracts.

Powell testified that he advised Mr. Minogue, the vice president of plaintiff, at the final inspection of the waterfront contract that the contract "looked good." Powell Dep. at 17. In answering questions concerning the waterfront contract Powell stated:

Question: Would it be fair to state that from your point of view that the overall quality of the work on the waterfront project was satisfactory?

Powell: At completion, yes.

Q: Would it be fair to say that the job was done on time?

A: Yes, it was completed within the schedule.

Q: Would it be fair to state that Mr. Minogue complied with your directives on the project?

A: Personally?

Q: Yes.

A: Yes.

Powell Dep. at 18. With respect to conversations he had with Commander Wisehart, a contracting officer for the Navy, Powell gave the following answers:

Question: Did Mr. Wisehart make any comments to you concerning his opinions on Mr. Minogue's integrity?

Powell: Yes.

Q: What did he tell you?

A: He didn't think very highly of him. I can't tell you—.

Q: Would it be fair to state that Mr. Wisehart stated the opinion that he felt Mr. Minogue did not have the requisite integrity to perform Navy work?

A: I believe so.

Q: Did Mr. Wisehart tell you that he felt that [plaintiff] was submitting fraudulent claims?

A: Back off a second. He didn't tell me directly. It was over—I overheard in the conversation. He didn't come up to me and tell me directly.

Q: You overheard him saying that in conversations?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: Did you overhear him talking to other people about claims that [plaintiff] submitted on the jobs?

A: Yes.

Q: What did he say generally about that?

A: Again, I can't tell you.

Q: Was he dissatisfied with [plaintiff's] claims?

A: Yes.

Q: Did he feel that the claims were fraudulent?

A: I didn't hear that.

Q: Do you recall Mr. Wisehart ever commenting to other persons that he felt [plaintiff] shouldn't get future work at the base?

A: Again, overheard. It wouldn't be directed at me.

Q: Right. But it's something you overheard,—

A: Yes.

Powell Dep. at 23–25.

The SBA also noted the Navy's displeasure with the plaintiff. In the SBA Report, it is noted:

The officials of the base maintain that the additional efforts required to monitor Leslie & Elliott are costly, and the base does not have the time or personnel to continue same. On this contract Leslie & Elliott had a full time inspector on the job site, and a full time project manager on the job site almost everyday. The assistant officer in charge of Construction on the job site frequently. The Base claims that no other contractor doing business on the Submarine Base requires this amount of administrative follow up that Leslie & Elliott requires. *The Base states that this situation can't continue, and don't want Leslie & Elliott to have any work on the base.*

SBA Report at 10 (emphasis the Court's).

Another issue raised during the hearing on the motion for a preliminary injunction was whether the Navy had been completely candid with SBA in discussing the plaintiff. Plaintiff contends that the Navy advised the SBA that Powell had to be assigned full time with the plaintiff because of deficiencies in plaintiff's work and that such an assignment was to the detriment of other work in that Powell was not free to make inspections elsewhere. Plaintiff contends that SBA was not informed that there wasn't enough work for Powell and second that he was there to monitor change order hours being performed. Mr. Keith Eugene Hubbard, an industrial specialist for SBA, who reviewed plaintiff's responsibility for the COC determinations, testified in a deposition as follows:

Question: Did Mr. Potuchek or Mr. Wisehart tell you that one of the reasons Ted Powell was assigned full time to the [waterfront] project was because he was running out of work?

Hubbard: No.

Q: Did Mr. Potuchek or Mr. Wisehart tell you that another reason they assigned Mr. Powell full time to the project was to monitor change order hours being performed by Leslie & Elliott?

A: No.

Q: Who specifically told you from the Navy that they had to assign a full-time inspection crew to oversee [plaintiff] to force quality out of them?

A: I would say it was Bill Potuchek.

Q: And did Captain Loyacano tell you that it was a strain upon the Navy's inspection work force to have to have Mr. Powell over there full time?

A: He did.

Q: In other words, it took away from other contracts that they had to inspect. Correct?

A: They took an inspector and put him on the job full time and it kept him from doing other—other jobs, yes.

Q: And kept him from doing other jobs that they needed him to inspect. Correct?

A: Yeah.

Q: And Capt. Loyacano told you that?

A: Yeah.

Motion Exhibit Hubbard Dep. at 14–15.

The above statements by representatives of the Navy in charge of considering the awarding of contracts is strong evidence that the Navy did not want to do business with the plaintiff. This conclusion was also reached by the SBA when it noted that: "The Base states that this situation can't continue, and don't want [plaintiff] to have any work on the base." While the Navy may well have been justified in seeking to avoid further contracts with the plaintiff, that is not the issue. Once the Navy has determined that it should no longer do business with the plaintiff, fair play and due process dictates that the Navy follow its debarment procedures, put the plaintiff on notice and conduct the necessary hearings before making a determination. *See Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 203 U.S.App.D.C. 371, 631 F.2d 953 (1980).

The Navy continues to argue that it has done no more than make a nonresponsibility decision with respect to the two subject contracts. But, during the course of oral arguments, counsel for the Navy suggested that the Navy would determine that the waterfront contract had been performed unsatisfactorily, and plaintiff noted that a contract put out for bids had been withdrawn when the plaintiff submitted a bid. Nothing in the record supports an argument that either of the above actions is other than action in the due course of business, but there is no question but that there is a strong suggestion that the plaintiff will not be considered for future contracts.

While it is not dispositive of the issue, it is also interesting that the plaintiff was low bidder on the two separate contracts that apparently are quite different in nature. The construction contract is for a small amount and it might seem that, although plaintiff might be rejected for the demolition contract due to past performances, it would have been accepted for the small jogging path contract. This again suggests that the plaintiff is unlikely to submit a successful bid.

In sum, there are a number of facts which support a finding that there was a *de facto* debarment of the plaintiff.

First, the contracts were not awarded to the plaintiff. This fact, standing alone, is not sufficient to find *de facto* debarment, but it is one in a chain of events leading to a conclusion that there was a debarment of the plaintiff. Another factor making the failure to award either contract to the plaintiff significant is the fact the two contracts are quite different in nature. One contract called for the demolition of a structure at a cost of over $200,000. Presumably, such work required stricter safety considerations than the construction of a jogging path. One of the criticisms made of the plaintiff is that it failed to comply with safety standards. *See* Defendants' Opposition Exhibits 1 and 2, Enclosures 1. Notwithstanding that the plaintiff is re-

quired to follow safety standards on all contracts, it would seem that safety would be extremely important in a demolition contract as opposed to a construction contract involving the installation of a jogging path.

Second, the contracting officer, Commander Wisehart, considered the plaintiff "an administrative burden requiring this office to spend an inordinate amount of time responding to extraneous issues raised by Leslie & Elliott in over 80 letters." *See* Defendants' Opposition Exhibit 2, Enclosure 10. Moreover, Commander Wisehart noted that: "Leslie & Elliott has demonstrated a *persistent* pattern of bidding jobs low and *exploiting* obscure flaws in the plans and/or specifications to the detriment of the Navy and the taxpayer." *Id.* (emphasis the Court's). He noted further: "Since it is virtually impossible to draft a perfect set of plans and specifications, it is incumbent upon both the Government and the contractor to exercise *integrity* in the reasonable solution of errors, omissons (sic) or ambiguities. Leslie & Elliott *persistently* seizes these opportunities to demand change orders that are *exhorbitant (sic) in terms of money, time or both.*" *Id.* (emphasis the Court's). These are the words of the contracting officer made in a Determination and Finding dated August 24, 1989. It is quite obvious that his comments go beyond addressing the two subject contracts and nothing is contained therein which suggest that he feels the problems are being addressed by the plaintiff or that it is likely that these matters will not reoccur in future contracts. He has noted that the plaintiff has not exercised "integrity" in working with past contracts and that the actions of the plaintiff are "persistent." Moreover, the Determination and Findings raises a suggestion of fraud and/or dishonesty in plaintiff's dealings with the government. Under such circumstances one must wonder why the plaintiff was not the subject of debarment proceedings.

Third, as is reflected in the portions of the depositions quoted above, Commander Wisehart did not limit his comments to formal findings, he mentioned and discussed the plaintiff's deficiencies informal-

ly and there is at least circumstantial evidence that his feelings about the plaintiff, and perhaps that of the Navy, were well known.

Fourth, is the fact that although Mr. Powell the construction representative may have felt that the plaintiff performed the waterfront contract in a satisfactory manner, although perhaps only after receiving construction compliance notices, Commander Wisehart in considering the same contract apparently did not agree. It is noted that Mr. Powell's deposition was taken on November 14, 1989 and the Wisehart statement was made on August 24, 1989.

Fifth, the SBA states its understanding of the Navy's position that the Navy "[doesn't] want Leslie & Elliott to have *any* work on the base." *See* SBA Report at 10.

Sixth, the Navy did not give a complete explanation as to the assignment of Mr. Powell to full time inspection of the waterfront project. While the Navy correctly argues that the significant factor is that it was necessary to assign Powell full time, there was added significance in allowing SBA and GAO to believe that it was necessary to pull Powell away from other pending work.

All of the above factors lead the Court to conclude that there has been a *de facto* debarment of the plaintiff. In reaching this conclusion that Court does not address the merits of any debarment action against the plaintiff. It may be that plaintiff should be debarred from future contracts with the Navy, but if this is so, it should only be after plaintiff has been given adequate notice of the charges against it and afforded an opportunity to defend against those charges. Moreover, the Court cannot find any authority for the proposition that a "temporary" debarment does not entitle plaintiff to due process protection.

### III

Having concluded that the plaintiff was the subject of a *de facto* debarment, the Court need not address the other issues raised in this case. The plaintiff is entitled to a debarment hearing and provided by the applicable regulations. Pending that hearing and any determinations thereon, the Court concludes that it is appropriate to enjoin the awarding of the subject contract absent a showing by the Navy that safety considerations or other considerations make it necessary to proceed with the contract or contracts without delay.

An appropriate order has been entered.

### ORDER

Pursuant to the Memorandum filed in this case, it is hereby

ORDERED that the hearing on the plaintiff's motion for a preliminary injunction is consolidated with a hearing on the merits, and it is further

ORDERED that the defendants are permanently enjoined from allowing the performance of work on Contract Nos. N62472–89–B–3436 and N62472–89–B–3378 by anyone other than the plaintiff until such time as they afford plaintiff a debarment proceeding pursuant to applicable rules and regulations.