CONSET CORPORATION and Stanley Zimmerman, Appellants,

v.

COMMUNITY SERVICES ADMINIS-TRATION, et al.

No. 80–1547.

United States Court of Appeals, District of Columbia Circuit.

Argued April 2, 1981.

Decided June 5, 1981.

William G. Kopit, Washington, D. C., with whom Robert D. Reif and Thomas M. Farah, Washington, D. C., were on the brief for appellants.

R. Craig Lawrence, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Ian Fan, Community Services Administration, Washington, D. C., were on the brief for appellees.

Before MIKVA and EDWARDS, Circuit Judges, and VAN PELT,* Senior District Judge for the District of Nebraska.

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1976).

# 1292

Opinion for the court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, Conset Corporation appeals from a summary judgment of the District Court holding that a decision by the Community Services Administration (CSA) not to approve a contract between Conset and the National Demonstration Water Project (NDWP) did not violate Conset's due process rights under the Constitution. In the proceedings before the District Court, Conset alleged a deprivation of liberty and property interests protected by the Due Process Clause of the Fifth Amendment. Because we find that there are genuine issues of material facts underlying the alleged violation of the appellants' liberty interests, we remand this case to the District Court for further proceedings.[1]

## I.  BACKGROUND

The Community Services Administration is a federal agency established by an act of Congress;[2] the agency was created in part to provide grants for pilot and demonstration projects such as the NDWP. *See* 42 U.S.C. § 2825(a) (Supp. III 1979) The relationship between CSA and NDWP was consummated in 1974 when agency officials agreed to provide funds to support a project designed to develop rural water and sewer facilities for low income families. Because NDWP did not have its own staff, it contracted with Conset Corporation to provide administrative services. Under that contract, Stanley Zimmerman, one of the appellants in this case, served as NDWP's

Executive Director while retaining his post as President of Conset.

On July 31, 1977, Conset's contract with NDWP expired, and the parties prepared a new contract for the six-month period from August 1, 1977 to January 31, 1978. At about the same time, during the summer of 1977, CSA's Deputy General Counsel came to believe that Zimmerman's dual role as President of Conset and Executive Director of NDWP amounted to an impermissible conflict of interest. Officials at both Conset and NDWP were notified of the charge on August 19, 1977, but disputed its validity. After meetings between counsel for NDWP, Conset and CSA, NDWP attorneys submitted a memorandum to CSA officials arguing that no conflict existed.

On November 14, 1977, by letter from Robert Smith, Assistant Director of CSA, to Olly Neal, President of NDWP, CSA finally approved the August 1 contract renewal between Conset and NDWP. Appendix (App.) at 243. Although the letter from CSA approved the NDWP-Conset contract for "the short term," strong reservations were expressed about the conflict of interest charge. In particular, Smith made it clear that CSA

> cannot agree, from either a legal or programmatic viewpoint, with [the NDWP-Conset] position that no conflict of interest issues are present in the NDWP-Conset arrangement. A very clear potential conflict exists.

*Id.* At the conclusion of his letter, Smith stated that:

> For the short term, I am approving the arrangement and the contract in question, subject to [certain] conditions . . . .

---

1. Although the District Court issued its memorandum order in response to appellees' "Motion to Dismiss," the parties have argued—and we agree—that the District Court actually granted a summary judgment in favor of appellees since it took into account documents and affidavits, matters that are outside of the pleadings. *See* Rules 12(c) and 56, Fed.R.Civ.P.

   In reviewing a summary judgment, we must determine whether there is a genuine issue of material fact and whether the appellee is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P. "In granting summary

judgment for respondents, the District Court [is] required to resolve all genuine disputes as to material facts in favor of petitioner." *Bishop v. Wood,* 426 U.S. 341, 347 n.11, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

2. CSA originally was established in 1964 as the Office of Economic Opportunity under the Economic Opportunity Act of 1964. CSA succeeded the OEO in 1975. *See* Headstart, Economic Opportunity, and Community Partnership Act of 1974, Pub.L. No. 93–644, § 9(a), 88 Stat. 2291 (1975).

For the longer term, I will rely on further staff work by CSA to determine whether the present arrangement is the one best suited to meeting our mutual goals.

*Id.* at 246.

On November 23, 1977, Neal responded to Smith's letter, protesting the conflict of interest charge, and suggesting that NDWP had submitted enough information for CSA to act in clearing Conset of the charges. App. at 248. Nevertheless, the parties subsequently negotiated language specifying the "conditions" to be incorporated as a part of any NDWP-Conset arrangements.[3] The final statement of the conditions was embodied in a memorandum, dated December 20, 1977, from Thomas Mack, Deputy General Counsel of CSA, to Robert Smith. App. at 252. The December 20 memorandum read as follows:

The attached conditions will cover any remaining issues regarding protection against any potential conflict of interests involved in the NDWP-Conset arrangements. They should be made NDWP grant conditions and in order to bind Conset, should be incorporated into any NDWP/Conset contract which requires CSA approval.

With these conditions, there are no audit or legal problems or issues regarding the NDWP/Conset relationship.

*Id.*

On December 21, 1977, counsel for NDWP sent a letter to Mack, acknowledging receipt of a copy of the December 20 memorandum and accepting the conditions stated therein. This letter read as follows:

Thank you for sending us a copy of your opinion that there are no audit or legal problems or issues regarding the NDWP/Conset relationship with the enumerated conditions made a part of the grant and incorporated into the NDWP/Conset contract. Of course,

NDWP accepts these conditions which codify existing NDWP/Conset practices. App. at 255.

Conset alleges in this action that, as a result of the Mack memorandum of December 20, 1977, officials at NDWP and Conset believed that the conflict of interest charge had been permanently resolved. However, Conset also alleges that, in January of 1978, there were "reports that CSA was continuing to circulate rumors of a 'conflict of interest.'" *See* Amended Complaint, ¶ 26, App. at 16. On February 1, 1978, Zimmerman wrote a letter to CSA officials to protest against these reports, but he received no response to his letter. *Id.* at 16–17.

On March 9, 1978, Frank Jones, General Counsel of CSA, issued a final opinion finding that the NDWP-Conset relationship involved an impermissible conflict of interest. Conset alleges that:

The March 9 "conflict of interest" decision was never provided to Conset or NDWP, nor were they informed of its existence or of the defendants' continued assertions that the arrangement between NDWP and Conset represented a "conflict of interest". Moreover, no opportunity was provided to rebut the factual and legal conclusions regarding "conflict of interest" which were contained in this memo. Conset did not become aware of the existence of the memo until the following September and the actual content of the memo was not made available by CSA until January 10, 1979, pursuant to a Freedom of Information Act request by Conset.

Amended Complaint, ¶ 29, App. at 17–18. The Amended Complaint also alleges that, "[o]n a number of occasions," CSA circulated the March 9 memorandum or described its contents to other governmental agencies, the Congress, and persons outside the Government.[4] *See* Amended Complaint, ¶ 30, App. at 18.[5]

---

**3.** The conditions required, among other things, that "whenever ... an individual's time is committed under the Conset contract to NDWP, the individual shall work during that period solely on NDWP matters," that "Conset shall sell no more than twelve (12) man-months of any individual's time per year," that "[a]ll financial records of Conset ... shall be available

to NDWP and CSA upon request," and that "[o]versight of NDWP finances ... shall be provided by the President of NDWP and other NDWP board members ...." App. at 253.

**4.** For example, Conset attached to an affidavit of Stanley Zimmerman a letter from William

**5.** See note 5 on page 1294.

On September 30, 1978, the expiration date of the last CSA grant to NDWP, Zimmerman resigned as Executive Director of NDWP. After the CSA grant expired, NDWP continued to incur expenses for services done by Conset, apparently believing that other agencies would fund NDWP. As the appellants suggest in their brief:

> It was anticipated by NDWP that FmHA [Farmers Home Administration] would retroactively reimburse contractors for services performed, or that CSA would permit a reprogramming of existing funds to pay for services, during this "bridge" period.

Appellants' brief at 20. Significantly, however, Conset does not identify a promise by CSA to provide such funds. In fact, on November 13, 1978, Jack Ramsey, CSA's Chief of Demonstration, wrote to NDWP that CSA would not provide NDWP with additional funds to cover costs incurred by Conset. See App. at 216. After CSA denied a request from NDWP for payment of these services, and after FmHA decided not to issue NDWP a grant to provide funds for Conset's services, the appellants filed suit against CSA and various officials for injunctive relief and damages.

The District Court denied the motion for injunctive relief and dismissed the case.[6] In ruling for the appellees, the District Court found that the appellants had no property rights to future contracts because they had "nothing more than a 'unilateral expectation' to a benefit." App. at 331, quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The court also found that CSA had not violated any liberty interests of appellants because " 'reputation alone, apart from some more tangible interests, such as employment' is not sufficient to invoke the protections of the Due Process Clause." App. at 331, quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). The District Court concluded that the March 9, 1978 memorandum did not violate the appellants' liberty or property interests because it

> did not result in a change in an existing contractual relationship since the contract between NDWP and Conset was renewed for the final period of the grant. This Court understands that NDWP is no longer a grantee of CSA and therefore, the March 9 memorandum does not affect Conset's present interest with NDWP.

App. at 331.[7] On appeal, appellants no longer seek injunctive relief, but continue

---

Hunt at the Department of Agriculture, dated September 7, 1978, in which Hunt asked CSA to review NDWP's grant application to the Farmers Housing Administration (FmHA), in light of the March 9 memorandum. See App. at 285. Through an affidavit, Conset claims that after CSA sent the March 9 opinion to the Department of Agriculture, Conset's role in the proposed grant was eliminated. See Affidavit of Stanley Zimmerman of Apr. 19, 1979, App. at 179.

5. Despite the March 9 memorandum, CSA awarded retroactively another grant to NDWP, to end on September 30, 1978, and approved two contracts between Conset and NDWP.

6. See note 1, supra.

7. After finding that the appellants had suffered no constitutional injury, the District Court concluded that the appellants could claim only injury resulting from defamation. The court then held that the individual appellees were entitled to absolute immunity for their allegedly defamatory actions:

> Since there was an obvious question of a potential conflict of interest, it was natural for the General Counsel to render a legal opinion for the benefit of CSA and its grantees. However, assuming for the moment that the memorandum is incorrect in its conclusion that there is a conflict of interest, and even assuming that the [appellants'] reputations have been harmed, these individual defendants are protected from a defamation action by absolute immunity.... Certainly, the rendering of [the March 9] opinion and the actions taken as a result thereof were "within the outer perimeter" of the [appellants'] duties.

App. at 332 (citations omitted), quoting *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959) (Harlan, J.). The appellants have not pursued the defamation claim on appeal.

The District Court also dispensed with Conset's claim against CSA that NDWP owed Conset $67,000 for services already performed. Since Conset had failed to join NDWP, an indispensable party, the court dismissed the claim under Rule 19 of the Federal Rules of Civil Procedure. This last claim has not been pursued on appeal.

to pursue their claim for damages for the alleged constitutional violations.

## II. DISCUSSION

Appellants argue that they suffered deprivations of constitutionally recognized property and liberty interests as a result of CSA's use and circulation of the March 9 conflict of interest memorandum. According to appellants, "the erroneous March 9 memo was developed and its contents distributed to federal agencies and congressional offices for the purpose of destroying the business opportunities of appellants." Appellants' brief at 31. Since the March 9 memorandum was *allegedly* developed and distributed by CSA officials without prior notification to appellants, and without giving appellants an opportunity to rebut its contents, appellants contend that they were denied due process.

### A. *Property Interest*

The first branch of the appellants' argument is that CSA denied appellants a property interest, in violation of the Due Process Clause of the Constitution.

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court discussed the availability of due process rights in the protection of property interests. The decision in *Roth* stressed that the Due Process Clause "is a safeguard of the security of interests that a person *has already acquired* in specific benefits." *Id.* at 576, 92 S.Ct. at 2708 (emphasis added). In particular, the Court noted:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it ....

[Property interests] are created and their dimensions defined by existing rules or understandings that stem from an independent source.

*Id.* at 577, 92 S.Ct. at 2709.

In *Roth*, which involved an untenured teacher's claim to continued employment, the Court held that

> the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment .... In these circumstances, the respondent surely had an abstract concern in being re-hired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

*Id.* at 578, 92 S.Ct. at 2709 (emphasis in original). Such a "property interest in employment can, of course, be created by ordinance, or by an implied contract." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).[8]

■ In the instant case, the appellants have not alleged any promise, express or implied, by CSA officials that CSA would provide NDWP with continued funding to pay for the work done by Conset after the CSA grant expired on September 30, 1978. Shortly after the March 9 memorandum had been written, CSA awarded its final grant to NDWP. The final grant ran until September 30, 1978, and, by the explicit terms of the grant, NDWP was required to obtain the prior approval of CSA before obligating any CSA funds or incurring any costs after September 30, 1978. Although appellants allege that they performed work for NDWP after September 30 "in anticipa-

---

8. The same day *Roth* was issued, the Supreme Court issued *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), holding that a professor may have a property interest in re-employment pursuant to a *de facto* tenure program:

> A teacher, ... who has held this position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure.

*Id.* at 602, 92 S.Ct. at 2700. The Court added, however, that:

> Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency.

*Id.* at 603, 92 S.Ct. at 2700.

tion of NDWP's refunding," they have conceded that CSA never approved of any NDWP-Conset arrangements after September 30. Appellants' brief at 26.

Even accepting appellants' allegations in the most favorable light, it is absolutely clear that they have pointed to nothing more than a "unilateral expectation" of a benefit.[9] Given this failure by appellants to allege some legitimate property interest to support the claim of constitutional infringement, we affirm the judgment of the District Court on this issue.

### B. *Liberty Interest*

On appellants' second claim, regarding the alleged deprivation of constitutionally protected liberty interests, we conclude that the District Court erred in holding that the appellees were entitled to judgment as a matter of law.

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court ruled that:

> [W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.

*Id.* at 573, 92 S.Ct. 2707, quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). However, the opinion in *Roth* also observed that "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.* 408 U.S. at 575, 92 S.Ct. 2708. In addition, in the later case of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court noted that:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701, 96 S.Ct. at 1160. *See also Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (holding that if the allegedly damaging charges are not made public, then they cannot properly form the basis for a claim that petitioner's interest in reputation was impaired).

This court recently has considered the "liberty" branch of the Due Process Clause. In *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir. 1980), it was held that

> when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken.

*Id.* at 955–56. The facts in *Old Dominion* clearly demonstrate both of the elements necessary to show a due process violation of a protected liberty interest. First, "a determination that Old Dominion lacked integrity was made and communicated through Government channels without [Old Dominion] having any notice that the determination had been made." *Id.* at 961. Second, as a result of that determination, Old Dominion was denied government contracts.

■ In light of this controlling case law, we believe that, at least on the face of the pleadings and supporting affidavits, appellants' claim of an infringement of protected liberty interests was sufficient to survive motions to dismiss or for summary judgment. We therefore reverse and remand on this second issue.

The undisputed facts reveal that appellants knew of and had various opportunities to respond to the conflict of interest charges raised by CSA between August and December of 1977. Consequently, up until December 20, 1977, by which date the parties had negotiated a set of conditions to

---

**9.** With respect to appellant Zimmerman, we find that, although he may have been forced to resign from his position with NDWP, he had no guarantee or legitimate expectation of continuous employment in that job so as to justify a claim of a "property interest."

govern the NDWP-Conset arrangement, Conset had received ample due process.[10]

However, as the appellants allege, the issuance of the December 20 memorandum led them to believe that the "conflict of interest" charge had been resolved permanently. As noted above, that memorandum stated: "With these conditions, there are no audit or legal problems or issues regarding the NDWP/Conset relationship." App. at 252. As a consequence of this statement in the December 20 memorandum, appellants contend that they had no reason to believe or to know that the conflict of interest charge was still an open issue at CSA.[11] Appellants also contend that they never received a copy of the March 9, 1978 memorandum, detailing the charges against them, until after CSA funding to NDWP had run out.

In light of these allegations, the meaning, purpose and use of the March 9, 1978 memorandum are critically significant to the proper resolution of appellants' liberty claim. The appellants have alleged—and have provided supporting affidavits and documents—that CSA circulated the March 9 memorandum to other governmental agencies, and that the memorandum was instrumental in preventing Conset from being awarded other government contracts. Conset had no opportunity to respond to the memorandum because it did not learn of its existence until September, 1978, and did not actually receive a copy of the memorandum until January of 1979. If the March 9 memorandum was effectively used to bar Conset from government contract work due to charges calling into question Conset's integrity, honesty or business reputation, then due process may have required that appellants "be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action [was] taken." *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d at 956.

As may be apparent from the foregoing, there are several important issues that must be resolved by the District Court on remand. Among these issues are the following: (1) whether the December 20, 1977 memorandum was intended to be a final resolution of the conflict of interest charge; (2) whether appellants had constitutionally adequate notice in January of 1978, or at other times during 1978, that the conflict of interest charge was still an open issue at CSA and, if so, whether this notice afforded appellants an adequate opportunity to respond to the concerns of CSA officials; (3) whether the March 9, 1978 memorandum was in fact circulated to persons outside of CSA and, if so, for what purpose; (4) whether the March 9, 1978 memorandum was in fact "stigmatizing"; [12] (5) whether

---

10. Surely, the Due Process Clause, under the present circumstances, does not require that the appellants be granted a formal hearing. In *Old Dominion* this court stated: "If every governmental decision required a full blown hearing involving all parties affected, the conduct of Government business would be greatly impaired." 631 F.2d at 968.

We simply hold that when a determination is made that a contractor lacks integrity and the Government has not acted to invoke formal suspension or disbarment procedures, notice of the charges must be given to the contractor as soon as possible so that the contractor may utilize whatever opportunities are available to present its side of the story before adverse action is taken. This minimal requirement will not burden the Government, and, indeed, is in the interest of both parties.
*Id.*

11. Because the District Court found that the appellants had not properly alleged a violation of their liberty interest, it did not reach the issue of whether Conset's knowledge of the renewed charge in January, 1978, *see* Amended Complaint ¶ 26, App. at 16–17, constituted constructive notice. If indeed Conset had sufficiently detailed knowledge to give it constitutionally adequate notice and adequate opportunity to respond to the charges, Conset may have been accorded all the process it was due. The resolution of this factual and legal issue is left to the District Court on remand.

12. The parties dispute whether the March 9 memorandum discussing the conflict of interest charge caused sufficient stigma to meet the first half of the *Paul v. Davis* test. We leave the resolution of this issue to the District Court. It may be instructive, however, to consider this court's opinion in *Southern Mutual Help Ass'n v. Califano*, 574 F.2d 518, 524 (D.C. Cir. 1977), where it was noted that it

is not difficult to imagine the inhospitable reception that would be given to future appli-

Conset did in fact suffer losses in government business that were attributable to the circulation of the March 9, 1978 memorandum; and (6) whether Zimmerman did in fact suffer any legally cognizable losses that were attributable to the circulation of the March 9, 1978 memorandum.

Appellants have alleged that the circulation of the renewed conflict of interest charge, and the denial of a "tangible interest," were done without notice and a chance to respond. If true, these actions by CSA may have constituted a denial of due process. We find that, since there are genuine issues of material facts to be resolved by the District Court, the case must be remanded for further proceedings. We express no view on the legitimacy of appellants' claims; we simply find that the claims with respect to the liberty interests were sufficient to survive motions to dismiss or for summary judgment.

### III. CONCLUSION

In accordance with the opinion above, the decision of the District Court is affirmed in part and reversed in part. The case is hereby remanded for further proceedings consistent with this decision.

*So ordered.*

cations from an organization that has been accused of . . . engaging in activities that create conflicts of interest.