Arif H. **MOSRIE**, Appellant,

v.

Marion S. **BARRY**, Jr., et al.

No. 82–1200.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 12, 1983.

Decided Oct. 7, 1983.

Axel Kleiboemer, Washington, D.C., for appellant.

William J. Earl, Jr., Asst. Corp. Counsel, Washington, D.C., of the Bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of the Court, with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge GINSBURG.

BORK, Circuit Judge:

This case involves a municipal employee's complaint that his lateral transfer and public criticism of his performance by supervisory officials deprived him of a liberty interest and thereby gave rise to due process rights that were not accorded him prior to the adverse actions. Relying principally on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the district court held after trial that the employee had not been deprived of a liberty interest. We assume on this appeal that the transfer and public criticism injured the employee financially and otherwise as he alleged in his complaint. We nevertheless affirm.

## I.

In the spring of 1979, appellant Arif H. Mosrie (plaintiff below) was commanding officer of the Homicide Branch of the Criminal Investigations Division of the District of Columbia Metropolitan Police Department. He had pursued a plainclothes ca-

reer for all but the first few years of his more than eighteen years as a police officer and had attained the rank of captain. Appellant's supervisor was William C. Trussell, commanding officer of the Criminal Investigations Division. Trussell's supervisor was appellee Burtell M. Jefferson, Chief of Police. Jefferson's supervisor, in turn, was appellee Marion S. Barry, Mayor of the District of Columbia.

In mid-March 1979, a union representative complained to Jefferson that Trussell was interfering with the work of officers in the Homicide Branch. Jefferson contacted Trussell indirectly and was told that nothing was amiss. Jefferson also had at least two conversations with Mosrie prior to mid-April. Mosrie informed Jefferson that, although there was some dissatisfaction in the Homicide Branch, morale problems were under control. Mosrie had told his officers that what they regarded as interference was management prerogative.

The officers of the Homicide Branch did not remain quiet for long. On April 26, Trussell transferred Lieutenant Raymond Pierson, an officer in the Homicide Branch, to a uniformed position. He did this with Jefferson's knowledge and consent but without informing Mosrie, who was Pierson's direct supervisor. The members of the Homicide Branch strongly disapproved of the transfer. They brought their union into the dispute. On several occasions in the days following April 26, Mosrie told his officers that the transfer had been ordered by the Chief of Police and so was not open to union discussion. He directed his officers not to protest. The union nonetheless sought to discuss the transfer with Trussell and Jefferson, both of whom refused on the ground that the matter was closed and was not the union's business.

Early on May 1, Mosrie heard of the union's efforts. A bit later that day, Trussell called Mosrie into his office to insist on his support. Mosrie then told his officers that the matter was closed because, as he had learned a few days earlier, Pierson had decided to retire rather than to accept the transfer. In mid-afternoon, two union rep-

resentatives handed Mosrie a memorandum, signed by almost all of the officers in the Homicide Branch, complaining in sharp terms of Pierson's transfer. They asked Mosrie to forward the memorandum to Jefferson. Mosrie asked the union representatives to withdraw the document, to think again about sending it, and to return the next day. They agreed.

The following day, May 2, Mosrie told the union representatives that he would not forward the memorandum to Jefferson. That afternoon, though, the union was able, through the intercession of someone on Mayor Barry's staff, to talk with Jefferson. Though informed of the memorandum, Jefferson did not ask to see it. Rather, he agreed to meet with the Homicide Branch on May 7—he planned to be out of town for several days before then—and asked that a list of specific grievances be drawn up for that meeting. Homicide Branch officers, without Mosrie present, met on May 3 to prepare the requested list.

By May 5, someone had given the list to the *Washington Post,* which ran a story about the entire affair on the front page of its Sunday, May 6, edition. The article reported the union's initially unsuccessful efforts to discuss the matter with Jefferson and quoted statements by Lt. Pierson that criticized Jefferson for not taking investigative and corrective action sooner than he did. When Jefferson returned to town on May 6, he read the article and became angry; Pierson's statements upset him most of all.

Early on Monday, May 7, Jefferson met with Mosrie. He demanded the memorandum of May 1 and criticized Mosrie for not forwarding it to him earlier. At his meeting with the Homicide Branch later that day, Jefferson was given the list of specific grievances that he had requested. The list named Mosrie, without his knowledge, as a witness to an alleged racial slur by Trussell. Jefferson gave Trussell a copy of the list to afford him an opportunity to respond. Shortly thereafter, Jefferson received a telephone call from Mayor Barry. He told Barry that he would investigate the matter

thoroughly and would give special attention to the allegation of Trussell's racial remark.

On May 8, Jefferson decided to convene a panel of three persons to conduct the investigation. He told Mayor Barry of this decision. Barry asked to be kept informed of the investigation's progress and conclusions so that he could consider taking appropriate action. The same day, Jefferson met with the members of the panel. He gave them the list of grievances and instructed them to concentrate on the racial matter first. He also told them that he was surprised, in light of his several conversations with Mosrie, that the situation had reached the point it had. In addition, he told the panel of Mosrie's failure to forward the May 1 memorandum to him.

When the panel began its proceedings on May 9, it called Mosrie to testify and asked him for his copy of the May 1 memorandum. The panel told him that it was investigating allegations against Trussell. It did not tell him that it was investigating Mosrie's own conduct. Nor did the panel inform Mosrie that he could present his own evidence or seek legal assistance. In his testimony on May 9, however, and again in testimony on May 22, Mosrie discussed his several conversations with Jefferson, the number of which (two or three) was a subject of dispute.

The panel gave Trussell many procedural protections it did not give Mosrie. It told Trussell of the charges against him, gave him an opportunity to respond to them, allowed him to present his own evidence, and permitted him to consult with counsel. It also listened to suggestions that the panel pursue certain evidentiary leads as well as to arguments and a summation. On one occasion, Trussell and the panel met privately and off the record.

On May 11, Trussell, through his lawyer, told Jefferson of an alleged anonymous telephone call in which Mosrie was accused of misusing the Department car assigned to

him. Jefferson referred the charge to the Internal Affairs Division (IAD). On May 14 or 15, Trussell contacted the IAD to make further allegations of misconduct on the part of Mosrie and others. When the IAD expressed hesitancy to investigate the additional charges, Trussell complained to Jefferson, who ordered the IAD to consider the new charges along with the old. The panel was aware of the IAD investigations.[1] In February 1980 the IAD determined that the charges against Mosrie were unfounded.

The panel completed its investigation of the alleged racial slur in late May 1979. It recommended issuance to Trussell of a written reprimand. At about the same time, Jefferson wrote to Mayor Barry that he intended to issue Trussell a Letter of Prejudice and to reassign Trussell, a reassignment that would be "temporary" and "nonpunitive." The panel completed the remainder of its investigation and delivered its final report to Jefferson by early August.

On August 14, 1979, the press reported that the panel had recommended a transfer of Mosrie from his command of the Homicide Branch. (It remains unknown how the press obtained the information.) Two days later, Mosrie, who by this time had counsel, delivered a letter to Jefferson asking him not to take any steps to implement the recommendation or to take any other adverse action without providing specified due process protections. In particular, Mosrie requested that he be given the panel's report and access to the record of its proceedings; that he be informed of the accusations against him, the names of his accusers, and the authority relied on by Jefferson in convening the panel; and that he be afforded an opportunity to introduce evidence, to cross-examine witnesses, and to present argument before the panel. Mosrie delivered a copy of the letter to Mayor Barry and asked him to consult with Jefferson about the requests for process.

---

1. The district court found that the panel did not consider the IAD investigations in reaching its conclusions about Mosrie, but the deleted footnote 14 of the panel report, which was attached

to the text's statement that Mosrie's "personal situation" had become serious, might well have been about the IAD investigations. See p. 1155 *infra.*

On August 27, almost two weeks after the press report of the panel's recommendations, Jefferson met with Mayor Barry and gave him the panel report as well as a transmittal memorandum Jefferson had prepared. In the memorandum, Jefferson responded to the allegation contained in the May 6 *Washington Post* article that he had failed to take the complaints about Trussell seriously and had therefore failed to take timely corrective action. Jefferson stated that his failure to intervene quickly was due solely to Mosrie's "deceptive and misleading" assurances that dissatisfaction with Trussell's behavior had not gotten out of hand. Jefferson recommended reinstatement of Trussell as head of the Criminal Investigations Division and transfer of Mosrie out of the Homicide Branch. Mayor Barry read the panel report and Jefferson's memorandum; he then approved Jefferson's recommendations.

Jefferson decided to announce his and Mayor Barry's decision at a news conference to be held on August 31. Despite the scheduling of the news conference, and despite the fact, as the district court found, that "[t]he final decision concerning the action to be taken with respect to plaintiff Mosrie was made by defendants on August 27, 1979," Jefferson wrote a letter to Mosrie's counsel on August 30 stating that no final decision had been made concerning Mosrie and that his requests for due process were therefore premature. Mayor Barry, who was given a copy of this letter for his signature but who did not sign it until September 7, read the letter to Mosrie's counsel.

On the morning of August 31, 1979, appellee Jefferson held the news conference as scheduled. He handed out the panel report, a minority panel report, his transmittal memorandum to Mayor Barry, and a press release announcing his decisions. Later that day, he distributed a press release from Mayor Barry endorsing his actions. Various statements in the distributed documents form the basis of Mosrie's lawsuit.

The panel report says that Mosrie's transfer was being recommended principally for his failure to forward the May 1 memorandum to Jefferson. The report states that Mosrie did not "decisively approach, and deal with, the expressed discontentment of the detectives." The panel found that, although Mosrie was aware of his detectives' discontent, he "elected neither to directly involve himself in defusing the brewing upheaval, nor even to indirectly alert other appropriate officials.... He, instead, after procrastinating for a day, chose to return the [May 1] Memorandum to his vociferous detectives...." The panel characterized these actions as a "dereliction of command obligations." It also concluded that Mosrie's statements to Jefferson in early April 1979 that morale problems within the Homicide Branch were under control constituted "specific deception." In addition, the panel report contains the obscure and unexplained statement that Mosrie's "personal affairs have escalated to the point that he cannot be reasonably expected to effectively handle them and simultaneously provide the Homicide Branch the attention its members will need."

The panel's minority report likewise characterizes Mosrie's actions as "derelictions of command obligations." It further states that these derelictions required Mosrie's transfer "minimally." Jefferson's transmittal memorandum, moreover, expressly, but without explanation, refers to the "matters now pending in the Internal Affairs Division," stating that his concurrence in the panel's recommendations was not based on any judgment about those matters. Finally, Jefferson's memorandum contains the accusation, mentioned above, that Mosrie's statements to him had been "deceptive and misleading."

When Jefferson completed his remarks at the news conference, Mosrie asked if he could speak. Jefferson told him to go through proper channels and left the meeting. Mosrie then went to the podium and told the press that he had not seen all the documents Jefferson had handed out but that he had not been deceptive and misleading. A police officer thereupon approached Mosrie to tell him that Jefferson had or-

dered him to stop speaking. Mosrie obeyed. Later, when Mosrie asked Jefferson for a public hearing, Jefferson denied the request because he did not want Mosrie to become a "martyr" in the public's eyes.

For several days following the news conference, the press ran stories on the affair. The local newspapers and television stations reported Mosrie's transfer and the reasons for it given in the documents released at the news conference. Thus, in particular, the press disseminated the characterization of Mosrie as "deceptive and misleading."

On September 9, 1979, Mosrie was transferred from the Homicide Branch to the Sixth District of the Metropolitan Police Department. He retained his rank as captain and his base salary. Moreover, his place in the Department's organizational structure remained roughly the same, and he still had some management responsibilities and potential for promotion. The formal comparability of Mosrie's old and new positions, however, mask significant differences in their real desirability.

Thus, whereas members of the Homicide Branch are plainclothes officers, members of the Sixth District wear uniforms. The Homicide Branch is considered an elite unit, whereas the Sixth District is viewed within the Police Department as a "dumping ground." Mosrie, when transferred to the Sixth District, lost such privileges as use of an official car for private as well as official purposes, a clothing allowance, opportunities for compensatory time-off, city-wide law enforcement responsibilities, and normal business hours of work. Although he remained a captain, Mosrie had very limited law-enforcement responsibilities in his new position because he was the fifth captain in a district that normally had four. Perhaps most important, Mosrie's opportunities for promotion were severely curtailed: of the eight commanding officers of the Homicide Branch from 1962 to 1979, all but Mosrie and the two who retired in the position were promoted to the grade of Inspector;

and by the time of the trial in this case, ten captains junior to Mosrie had been promoted to the grade of Inspector, among them Mosrie's successor at the Homicide Branch. Promotion to the grade of Inspector results in a salary increase of $4,000 per year and in higher retirement pay.[2]

Subsequent to the transfer and news conference, Mosrie suffered losses as well in several outside business interests, though the district court said—without elaboration—that it was "unclear" whether those losses were caused by the transfer and public criticism or by the Internal Affairs Division investigation. First, prior to August 31, 1979, Mosrie had been a paid lecturer for the Law Enforcement Assistance Administration, the International Association of Chiefs of Police, and the Drug Enforcement Administration, earning altogether about $600 per year. After that date, he was not again invited to lecture by these organizations. Second, prior to August 31, Mosrie was a paid instructor on law enforcement for the University of Maryland. After that date, the University three times refused to retain him, resulting in a loss of $500 in fees. Finally, Mosrie owned a company that provided training for security guards. The receipts of that company diminished significantly—by perhaps $5,000—in the year following August 31, 1979.

Appellant Mosrie brought suit against appellees Jefferson and Barry on August 29, 1980. His complaint described the events leading up to the press conference and his transfer much as we have recounted them; that is, his factual allegations were very close to the facts ultimately found by the district court. Mosrie claimed that his transfer and public criticism by appellees deprived him of "property and rights" without due process of law. He sought compensatory and punitive damages under 42 U.S.C. § 1983 (Supp. V 1981) for this alleged fifth amendment violation.

After trial, the district court rejected appellant's claims. The district court first

---

**2.** The district court found Mosrie's "management responsibilities, duties and promotional potential" after his transfer comparable to

those before. In light of the evidence in the record, we read this statement as a conclusion about formal duties and potential.

found, relying on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), that Mosrie had no property interest in his position as chief of the Homicide Branch because he had no legitimate claim of entitlement to the position. The court found that Mosrie's transfer was a lateral transfer, not a reduction in rank, and that lateral transfers, even at a management level from a plainclothes to a uniform position and even with an accompanying loss of certain privileges, though unusual, are within the express authority of the Chief of Police under D.C. Code Ann. § 4–104 (1981) and not limited by any regulations, policies, or entitlement-generating practices of the Police Department. With respect to Mosrie's claim that appellees deprived him of a liberty interest, the district court stated that, under *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), as interpreted in this circuit, Mosrie would have to show both public stigma and some additional tangible injury. The court held that Mosrie's transfer, being a lateral transfer, was not sufficient tangible injury and that the injury to Mosrie's outside business interests, besides not being clearly shown to have been caused by appellees' actions, was not severe enough to meet the test of *Paul v. Davis.* Finally, recognizing that appellees are entitled to qualified official immunity, the district court held that both appellees acted without malice, in good faith reliance on the panel's report and on D.C. Code Ann. § 4–104, and without any reason to suspect that their actions violated any clearly established constitutional rights of appellant.[3] The district court filed findings of fact and conclusions of law and entered judgment for appellees on January 29, 1982. This appeal followed.

## II.

Appellant Mosrie does not challenge the holding of the district court that he had no property interest in his Homicide Branch position that entitled him to due process protections before being transferred. *See* Appellant's Reply Brief at 4. He claims, however, that the district court erred in holding that he had not been deprived of a liberty interest when he was "publicly stigmatized by what Jefferson released to the media on August 31, 1979." Appellant's Brief at 37 (footnote omitted).[4] Mosrie also claims that the district court erred in ruling that appellees are entitled to immunity from liability for damages.

The issues of immunity and of a constitutional liberty interest in this case cannot be addressed separately. Under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which all parties agree governs the immunity inquiry in this case, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 2739. To answer "this threshold immunity question," a court "may determine, not only the currently applicable law, but whether that law was clearly established at the time" of the challenged action. *Id.* "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

In this case the threshold immunity question is whether it was clearly established in 1979 that appellant had a liberty interest of which appellees deprived him. Our conclusion that current law accords appellant no such liberty interest requires affirmance of the district court's judgment on the merits. Since our analysis makes clear that the

---

**3.** The district court also found that "Barry had no personal involvement in the facts giving rise to [Mosrie's] claim." In light of our disposition of the other issues, we need not address appellant's contention that this finding is clearly erroneous.

**4.** If appellant means to claim a deprivation of a property as well as a liberty interest from the combination of stigmatizing comments and the consequent injuries he alleges, we think our analysis of the liberty-interest claim also disposes of any property-interest claim.

applicable law has not changed in any relevant respect since 1979, it follows from this decision that the district court's judgment was also correct on the immunity question.

As all parties agree, appellant's claim that he was deprived of a liberty interest is governed chiefly by the Supreme Court's decision in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The Court there held that an individual who had been defamed by public officials had no due process claim because he had not been deprived of a liberty interest. Appellant here seeks to escape the holding of *Paul v. Davis* by arguing that he suffered harm not only to his reputation but also to his outside business interests (as a result of the stigma) and to his current and prospective job benefits (as a result of the transfer). Even if we were to agree with appellant that the harm to his business interests was in fact caused by appellees' public criticism of him, however,[5] *Paul v. Davis* can only fairly be read as mandating rejection of the argument that appellant suffered a deprivation of a liberty interest.

▮ First, that financial harm is caused by government imposed stigma does not transform an interest in reputation into a liberty interest. *Paul v. Davis* stated the question presented as "whether respondent's charge that petitioners' defamation of him, standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment." 424 U.S. at 694, 96 S.Ct. at 1157. The Court answered the question: "we conclude that it does not." *Id.* Thus, the Court held that defamation alone is not enough to give rise to a due process right; "other governmental action" is required. Proof of damages caused by a defamation does not meet that requirement. The Court was well aware of the "frequently drastic effect of the 'stigma' which may result from defamation by the government," *id.* at 701, 96 S.Ct. at 1160; it was also aware that

actual monetary damages are often proved (because required) in defamation actions, *id.* at 697, 96 S.Ct. at 1158. Indeed, in explaining that harm to reputation is not a deprivation of liberty, the Court quoted Justice Reed from *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951): the defamation may be "hurtful to [the plaintiffs'] prestige, reputation and *earning power*" but nonetheless does not deprive them of a fifth amendment liberty. 424 U.S. at 704, 96 S.Ct. at 1162 (quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. at 202, 71 S.Ct. at 664) (emphasis added).

To accept appellant's argument would be to ignore the Court's own statement of its holding, a statement evidently made in the awareness that financial loss may be caused by defamation. It would also be to read the case as having turned on the happenstance that the plaintiff failed to allege monetary damages flowing from his defamation. The plaintiff in *Paul v. Davis* did, however, allege serious impairment of his future employment opportunities as well as of his ability to enter and shop in local stores. 424 U.S. at 697, 96 S.Ct. at 1158. He also cited his employer's warning that he "had best not find himself in a similar situation in the future." *Id.* at 696, 96 S.Ct. at 1158. These allegations are certainly similar to those made by appellant here. Since many, if not all, persons defamed by public officials could allege such damages, appellant's reading of *Paul v. Davis* would go a long way toward producing the result specifically disapproved by the Court: the constitutionalizing of the ordinary defamation action brought against a public official. 424 U.S. at 698–99, 96 S.Ct. at 1159–60. The Court rejected such a consequence as having no foundation in the Constitution and, in particular, as inconsistent with the constitutional notion of "liberty."

As the Supreme Court recently explained, "liberty interests protected by the Fourteenth Amendment may arise from two

---

5. The district court expressed doubt that appellant had proved causation. *See* pp. 1156–1157 *supra.* We assume *arguendo* in the remainder of this opinion that appellant adequately proved the causal connection.

sources—the Due Process Clause itself and the laws of the states." *Hewitt v. Helms,* —— U.S. ——, ——, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Likewise, of course, liberty interests protected by the fifth amendment may arise either from the Constitution or from federal (here, District of Columbia) law. *Paul v. Davis* held that reputation alone is neither a liberty interest arising from the Constitution itself nor a liberty interest arising from state law where no special protection is given the interest in reputation beyond the general protection of tort law. 424 U.S. at 710–12, 96 S.Ct. at 1164–65.[6] Since District of Columbia law provides no special protection for reputation beyond tort law, reputation in the District is not among the interests "comprehended within the meaning of either 'liberty' or 'property.'" *Id.* at 710, 96 S.Ct. at 1164.

Interests that qualify as liberty interests "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law." 424 U.S. at 710, 96 S.Ct. at 1164. Due process guarantees "apply whenever the State seeks to remove or significantly alter that protected status." *Id.* at 711, 96 S.Ct. at 1165. The plaintiff's defamation in *Paul v. Davis* did not deprive him of liberty, the Court reasoned, because it was not true that "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State," the Court said, that was the basis for earlier liberty-interest decisions applying procedural guarantees. *Id.*

Since reputation alone does not constitute a liberty interest, we must ask whether appellees' actions deprived appellant of some other interest that rises to constitutional status. We must ask, that is, whether the interests of appellant that were harmed as a result of appellees' actions were recognized and protected by District of Columbia law and were officially removed from that recognition and protection. *Paul v. Davis's* analysis of prior cases helps explain the meaning of the requirement of official removal of legal protection of an interest.[7]

*United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), involved a legislative proscription on the plaintiffs' "ever holding a government job." *Id.* at 314, 66 S.Ct. at 1078, *quoted at* 424 U.S. at 702, 96 S.Ct. at 1161. *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), in-

**6.** It might be thought possible to read *Paul v. Davis* as holding not that the plaintiff had no liberty interest but that he had not been deprived of what liberty interest he had because state tort-law remedies were still available. That reading would not be correct. *Cf. Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (prison official's negligent loss of prisoner's mail-ordered hobby kit constituted deprivation of property, but state postdeprivation tort claims procedure provided all the process due). First, *Paul v. Davis* described its holding in a fashion inconsistent with such a reading: "we hold that the interest in reputation asserted in this case is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." 424 U.S. at 712, 96 S.Ct. at 1165. Thus, the Court held that plaintiff had no liberty interest, not that he had not been deprived of it. Second, the Court's emphasis in subsequent cases, *e.g., Olim v. Wakinekona,* —— U.S. ——, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983), *Hewitt v. Helms,* 103 S.Ct. 864 (1983), on the specificity of state-law protection of an interest, not on the existence of state-law remedies for its vindication, indicates that the reference in *Paul v. Davis* to the state's tort-law protection of reputation, 424 U.S. at 712, 96 S.Ct. at 1165, was intended merely to demonstrate that reputation was subject to no special protection sufficient to give rise to a liberty interest. As *Hewitt v. Helms* indicates, once an asserted interest is found to be a liberty interest, due process guarantees attach, and there is no intermediate inquiry into whether the existence of state-law remedies means that the person complaining of deprivation has not in fact been deprived of the interest. 103 S.Ct. at 871–72.

**7.** We do not discuss these cases for their holdings. Some, such as *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), did not even address a due process question. They are important for our purposes because the *Paul v. Davis* Court referred to them in explaining what it understood the Constitution to mean by "liberty."

volved "a determination of status—a proceeding to ascertain whether the organization is or is not 'subversive'"—and "actions of regulatory agencies that are moving in the wake of the Attorney General's determination to penalize or police these organizations." *Id.* at 175, 71 S.Ct. at 650 (Douglas, J.), *quoted at* 424 U.S. at 703, 96 S.Ct. at 1161. *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), involved "a potential 'badge of infamy' which might arise from being branded disloyal by the government." 424 U.S. at 705, 96 S.Ct. at 1162. That harm, however, was not sufficient to invoke due process rights; in any event, the plaintiffs in the case "would, as a result of their failure to execute the state loyalty oath, lose their teaching positions at a state university." *Id. Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), involved the discharge of an employee of a government contractor but was "'not a case where government action ... operated to bestow a badge of disloyalty or infamy, *with an attendant foreclosure from other employment opportunity.'*" 424 U.S. at 705, 96 S.Ct. at 1162 (*quoting* 367 U.S. at 898, 81 S.Ct. at 1750) (emphasis supplied by *Paul v. Davis* Court).

The *Paul v. Davis* majority summed up its reading of these cases as follows:

> The Court has recognized the serious damage that could be inflicted by branding a government employee as "disloyal," and thereby stigmatizing his good name. But the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying *loss of government employment.*

424 U.S. at 706, 96 S.Ct. at 1163 (footnote omitted; emphasis added). The Court then turned to an analysis of the three principal cases prior to *Paul v. Davis* that are relevant to determining the meaning of constitutional "liberty" where reputational harm is involved.

*Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), found a

deprivation of liberty where the state publicly labeled the plaintiff an excessive drinker by "posting"—that is, by forbidding in writing the sale of alcoholic beverages to her. According to *Paul v. Davis,*

> the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry. "Posting," therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards.

424 U.S. at 708–09, 96 S.Ct. at 1164. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), as interpreted by the *Paul v. Davis* Court, reinforced that reading of *Constantineau.* In *Roth,* the Court acknowledged that government action defaming an individual might entitle the person to due process rights, *see* 408 U.S. at 573, 92 S.Ct. at 2707, but, according to the *Paul v. Davis* Court,

> the defamation had to occur in the course of the termination of employment. Certainly there is no suggestion in *Roth* to indicate that a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee.

424 U.S. at 710, 96 S.Ct. 1164. Finally, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), held that the plaintiff's suspension from an Ohio public school was a deprivation of liberty. That holding according to the *Paul v. Davis* Court, depended on the facts that "Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right." 424 U.S. at 710, 96 S.Ct. at 1164.

■ It was against this background review of cases that *Paul v. Davis* formulated its rule that deprivation of liberty must involve a removal, extinguishment, or significant alteration of an interest recognized

and protected by state law. 424 U.S. at 710–11, 96 S.Ct. at 1164–65. For a defamation to give rise to a right to procedural due process, it is necessary—we need not say when it is sufficient—that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay. The latter, more general category requires that the government either have formally deprived one of a legal right, such as the right to purchase liquor or to drive, or have so severely impaired one's ability to take advantage of a legal right, such as a right to be considered for government contracts or employment or a right to seek non-government employment,[8] that the government can be said to have "foreclosed" one's ability to take advantage of it and thus extinguished the right.

The several relevant cases decided by this court illustrate the meaning of the *Paul v. Davis* conception of liberty. In *Conset Corp. v. Community Services Administration,* 655 F.2d 1291 (D.C.Cir.1981), we held that due process guarantees may apply if the plaintiff showed that a government "memorandum was effectively used to *bar* [plaintiff] from government contract work due to charges calling into question [plaintiff's] integrity, honesty or business reputation." *Id.* at 1297 (emphasis added). *Conset Corp.* relied on the "controlling case law," *id.* at 1296, of *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980), which held that a government contractor has due process rights "when the Government effectively bars [the] contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity." *Id.* at 955–56. "[T]he Government action in

[*Old Dominion*] effectively foreclosed Old Dominion's freedom to take advantage of other Government employment opportunities, and barred [Old Dominion] from all public employment." *Id.* at 964. *Rolles v. Civil Service Commission,* 512 F.2d 1319 (D.C.Cir.1975), though decided prior to *Paul v. Davis,* is likewise consistent with the Supreme Court's pronouncements. The *Rolles* court found that the plaintiff had been deprived of a liberty interest when he had in effect been removed from the Civil Service as a direct result of accusations of dishonesty. Thus, the principal recent cases from this court in which a government-imposed stigma was found to have deprived the stigmatized person of a liberty interest involved either loss of employment or foreclosure of a right to be considered for government contracts in common with all other persons.

■ The harms suffered by appellant in this case do not meet the *Paul v. Davis* requirement of loss of a government position or change in legal status. Appellant was merely transferred laterally, not discharged from government employment or demoted in rank and pay. To find the lateral transfer a deprivation of liberty would be inconsistent with *Paul v. Davis's* repeated emphasis on "loss of government employment." 424 U.S. at 706, 96 S.Ct. at 1163, and, in particular, with its reading of *Roth* as requiring a "termination of employment," *id.* at 710, 96 S.Ct. at 1164. *See* p. 1160 *supra.* Appellant retained not only a job but his salary and rank; he did lose some promotion potential and a variety of responsibilities and perquisites to which, because of the broad discretion of appellees to transfer appellant as they did,[9] he can lay

8. Of course, we assume nothing about what such rights can be found in federal or in state law.

9. In rejecting a prisoner's argument that he had a state-created liberty interest in not being transferred to an out-of-state prison, the Supreme Court recently stated:

[A] State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the

State's decisionmakers." If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," the State has not created a constitutionally protected liberty interest.

*Olim v. Wakinekona,* 103 S.Ct. at 1747 (citations omitted).

no legal claim. Neither the Supreme Court nor this court has held anything but an actual loss of employment or change of legal status sufficient to qualify as a deprivation of liberty when accompanied by stigmatizing remarks. Appellant's transfer resulted in neither. Since we may fairly assume that a discretionary lateral transfer was within the contemplation of the Supreme Court when it rejected the notion that "a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee," 424 U.S. at 710, 96 S.Ct. at 1164, we cannot conclude that appellant's transfer deprived him of a liberty interest.

The harm suffered by appellant to his outside business interests likewise cannot qualify as a deprivation of liberty because it does not amount to a change in legal status, the "other governmental action" required, when there is no loss of government employment, to transform a defamation into a deprivation of liberty. All that appellant has shown—assuming that we reject the district court's doubts about appellant's proof that his outside business losses were caused by appellees' challenged actions, *see* note 4 *supra*—is that he earned less money in his security-advice business than he had prior to his being publicly criticized and that several institutions for which he had been a lecturer no longer asked him to serve in that capacity. Appellant has not proven or even alleged that he had been deprived of a legal right to engage in an occupation or to seek any particular position. The reaction of others to unfavorable publicity about a person is not, within the meaning of *Paul v. Davis,* a change in legal status imposed by the government officials who generated the publicity. As Justice

Jackson said, "[t]hese, however, are sanctions applied by public disapproval, not by law." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. at 123, 71 S.Ct. at 624, *quoted in Paul v. Davis,* 424 U.S. at 703, 96 S.Ct. at 1161. Financial loss and loss of some employment opportunities do not, therefore, amount to an alteration of a legal right. That must be so even if some of the job opportunities lost are for public jobs, at least when as in this case, the stigmatizing government has no legal authority to alter legal rights to seek employment with another government. Moreover, given the current size of public-sector employment, any other result would substantially undercut the ruling of *Paul v. Davis.* In the circumstances of this case, we conclude, the harm resulting from appellees' stigmatizing of appellant has not been shown to be an alteration of legal status. It therefore does not constitute a deprivation of liberty.

The judgment of the district court is

*Affirmed.*

GINSBURG, Circuit Judge, concurring:

In *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), the Supreme Court said: "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." If the *Constantineau* opinion controlled this case,[1] Mosrie's complaint could not be dismissed for failure to present a liberty interest sheltered by the due process guarantee.

But five members of the Court "re-rationaliz[ed] ... earlier cases"[2] in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The Court's "re-ration-

---

1. For other opinions close in time to *Constantineau* consistent with the view that due process secures to the individual an opportunity to clear his or her name when exposed to a reputation-damaging charge by a government official, see *Goss v. Lopez,* 419 U.S. 565, 574–76, 95 S.Ct. 729, 736–37, 42 L.Ed.2d 725 (1975),

*Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), and *Jenkins v. McKeithen,* 395 U.S. 411, 426–28, 89 S.Ct. 1843, 1851–52, 23 L.Ed.2d 404 (1969).

2. Monaghan, *Of "Liberty" and "Property,"* 62 CORNELL L.REV. 405, 424 (1977).

alization" requires us to assume *Constantineau* turned not on the alleged official assault on the complainant's reputation, not on the "stigma or badge of disgrace"[3] attending the public listing of complainant's name as an alcoholic, but on official deprivation of a right "previously held under state law" to buy liquor.[4]

Trenchant commentary on *Paul v. Davis*[5] observes that "in a 'Constitution for a free people,' it is an unsettling conception of 'liberty' that protects an individual against state interference with his access to liquor but not with his reputation in the community."[6] Traditionally, the security of one's reputation has been recognized as a right without which "it is impossible to have the perfect enjoyment of any other advantage or right."[7] To banish the interest in a person's good name from the concept of liberty sheltered by due process "stands wholly at odds with our ethical, political, and constitutional assumption about the worth of each individual."[8]

The complainant in *Paul v. Davis*, like Mosrie here, recited material losses, includ-ing serious impairment of his employment opportunities and interference with his ability to purchase goods from merchants in his home community.[9] The two cases, I believe, are not subject to sensible distinction. Until the Court revisits the question whether a person's good name is a liberty interest, protected by the Constitution against arbitrary government deprivation, we are obliged to follow *Paul v. Davis,* and its strained reading of earlier decisions. Based on the accurate rendition of *Paul v. Davis* reasoning in Judge Bork's opinion, but emphasizing penetrating criticism of the High Court's opinion, I concur.

---

**3.** *Constantineau,* 400 U.S. at 436, 91 S.Ct. at 509 ("The only issue present here is whether the label or characterization given a person by 'posting,' ... is to others such a stigma or badge of disgrace that procedural due process requires notice and an opportunity to be heard.").

**4.** *Paul v. Davis,* 424 U.S. at 708–09, 96 S.Ct. at 1164. *But see* Shapiro, *Mr. Justice Rehnquist: A Preliminary View,* 90 Harv.L.Rev. 293, 326 (1976) ("There is not the slightest hint anywhere in the [*Constantineau*] opinion that the loss of the right to buy liquor was necessary, or even relevant, to the result."); *The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 56, 93 n. 44 (1976) [hereafter, *1975 Term*] (examination of Wisconsin statutes revealed no provision conferring on the citizenry a right to buy liquor).

**5.** Monaghan, *supra* note 2, 62 Cornell L.Rev. at 423–29; Shapiro, *supra* note 4, 90 Harv.L.Rev. at 324–28.

**6.** Monaghan, *supra* note 2, 62 Cornell L.Rev. at 426; *cf. Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (author of *Paul v. Davis* recognizes as a deprivation of a constitutionally-protected interest loss through negligence of prison officials of a prisoner's mail-ordered hobby kit).

**7.** 1 W. Blackstone, Commentaries * 134, *quoted in* Monaghan, *supra* note 2, 62 Cornell L.Rev. at 426.

**8.** Monaghan, *supra* note 2, 62 Cornell L.Rev. at 427. *Paul v. Davis,* in re-rationalizing earlier cases, does recognize "reputation plus" interests as constitutionally protected. For example, in referring to *Board of Regents v. Roth,* the *Paul v. Davis* opinion, 424 U.S. at 709–10, 96 S.Ct. at 1164, reasons that an unprotected interest in an untenured position plus an unprotected interest in reputation equals a protected interest. The logic of this analysis is not crystalline. *See 1975 Term, supra* note 4, 90 Harv. L.Rev. at 93 n. 44.

**9.** *See* 424 U.S. at 697; *1975 Term, supra* note 4, 90 Harv.L.Rev. at 100 & n. 85.