CONSET CORPORATION, et al., Plaintiffs,

v.

COMMUNITY SERVICES ADMINISTRATION, et al., Defendants.

Civ. A. No. 79–1174.

United States District Court, D. Columbia.

March 16, 1985.

William G. Kapit, Washington, D.C., for plaintiffs.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., for defendants.

MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

The plaintiffs, Conset Corporation and its principal shareholder, Stanley Zimmerman, filed this action on April 27, 1979.[1] Plaintiffs allege that the manner in which the defendant agency officials terminated a business arrangement between Conset and the National Demonstration Water Project, a nonprofit federal grantee, infringed their Fifth Amendment due process rights. The matter is presently before the court on defendants' motion to dismiss, or for summary judgment.

I

The defendants Mr. Olivarez, Mr. Smith, Mr. Jones, and Mr.Ramsey were Director, Assistant Director, Chief Legal Officer and Chief of the Demonstration Division, respectively. The defendant, Community Services Administration (CSA),[2] was a federal antipoverty agency established by the Economic Opportunity Act of 1964, as amended, 42 U.S.C. §§ 2701 *et seq.* Section 2825 established pilot and demonstration projects, conducted by public or private agencies, designed to test or assist in the development of new approaches or methods that would aid in overcoming special conditions in furtherance of the public interest. The National Demonstration Water Project (NDWP), designed for the purposes of developing local water and sewer facilities for low income families, was such a demonstration project. Plaintiff, Conset Corporation, was a service corporation that sold management services to NDWP. Plaintiff, Stanley Zimmerman, the President of Conset, also served as the Executive Director of the NDWP until September 30, 1978.

In August 1977, the new administration of CSA began a re-evaluation of NDWP as a CSA demonstration project. In the course of reviewing that project, the propriety of Conset's contractual relationship

---

1. The action is on remand from the court of appeals. *Conset Corporation, et al. v. Community Services Administration, et al.,* 655 F.2d 1291 (D.C.Cir.1981).

2. The CSA has been since abolished by the Omnibus Budget Reconciliation Act of 1981, Public Law 97–35, August 13, 1981, 95 Stat. 357, effective September 30, 1981.

with NDWP was also evaluated. NDWP, a CSA grantee, had contracted its entire grant to Conset, a for-profit corporation, to carry out the NDWP program. An August 17, 1977, preliminary opinion indicated, that in light of Mr. Zimmerman's position as both the President and major stockholder of Conset, and as the Executive Director of NDWP; this business relationship constituted a "conflict of interest" in violation of OEO[3] Instruction Number 6909–01.

In 1977, CSA officials discussed the "dual status issue" with representatives from both the NDWP and Conset. A subsequent memorandum, dated November 7, 1977, also explored the potential conflict of interest issue. Discussions continued between the three parties and the plaintiffs were advised of the existence of the potential conflict issue, although the prior OEO/CSA administrations had always approved of the NWDP/Conset arrangements. Plaintiffs were instructed that even though the past arrangements had been consistently approved, the NDWP had not heretofore violated Instruction Number 6909–01, because the regulations permitted such conflicts to exist, provided that they were specifically approved by the CSA. *See* Mack affidavit ¶ 4. Despite the lingering existence of the potential conflict of interest, a "short term" contract was approved through January 1, 1978. CSA thereafter decided to provide further funding to NDWP and established a final grant for that organization which terminated on September 30, 1978. This grant was made on August 24, 1978, retroactively effective through February 1, 1978. CSA contends that the termination had nothing to do with the conflict of interest issue; rather, the officials felt that NDWP had fully demonstrated its effectiveness as a "demonstration" project and was suitable for funding by other agencies.

In late February 1978, it came to the attention of CSA officers that the plaintiffs were representing to government and congressional officials that CSA had determined that there was no potential conflict of interest in the NDWP/Conset arrangement. It was at this juncture that the Assistant Director of the Office of Legal Affairs and General Counsel were compelled to issue the "General Counsel's Final Opinion Memorandum" dated March 9, 1978. It is this memorandum which is the subject of this action.

Defendants contend that the March 9, 1978 memorandum was issued by high agency officials and counsel, as a final legal opinion re-evaluating the relationship between Conset and NDWP. Plaintiffs contend that they suffered substantial harm as a result of the memorandum and its alleged circulation outside the agency. Plaintiffs maintain that the memorandum ultimately forced the resignation of Zimmerman as Executive Director of the NDWP, foreclosed Conset's business opportunities, and eventually drove Conset out of business. Plaintiffs seek damages for violation of their constitutional rights, alleging that the defendants failed to afford them adequate notice and sufficient opportunity to respond, subsequent to the preparation of the allegedly "stigmatizing" March 9th memorandum, and before the allegedly "adverse action" of its dissemination outside of the agency.

This court dismissed the action and denied plaintiffs' motion for injunctive relief.[4] The court of appeals, 655 F.2d 1291, affirmed the decision that plaintiffs had no property rights; but reversed and remanded on the issue of whether plaintiffs had a "liberty interest" which would implicate due process protection.[5] However, this Court resolves the action on the basis of two jurisdictional issues which have not heretofore been considered.

## II

The defendants moved to dismiss the action, or for summary judgment, asserting

---

**3.** The predecessor of CSA was the Office of Economic Opportunity (OEO).

**4.** Memorandum Order dated April 18, 1980.

**5.** *Conset Corp.*, 655 F.2d at 1298.

*Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), to stand for the proposition that "there can be no individual liability for damages because the defendants are entitled to qualified immunity as a matter of law." In *Procunier*, an inmate, alleging infringement of his First Amendment rights, sought damages for the prison officials' interference with the outgoing prisoner mail. Noting that during the period of the alleged constitutional violations, there was no "clearly established" right protecting an inmate's mail privileges, the Supreme Court held that summary judgment was appropriate because "the defendant officials were entitled to qualified immunity as a matter of law." *Id.* 434 U.S. at 565, 98 S.Ct. at 861.

The plaintiffs, in opposition, maintain that the qualified immunity defense is not available to the individual defendants because they "should have known" that their challenged actions would violate the plaintiff's constitutional rights. The Court finds that the government officials are entitled to qualified immunity as a matter of law.

### a) *The Appropriate Qualified Immunity Standard*

The former *Procunier* test encompassed both objective and subjective components:

qualified immunity [was] denied an official who knew or should have known that the action he took within the sphere of official responsibility would violate the constitutional rights of the [complainant], or if [the official] took the action with malicious intention to cause a deprivation of constitutional rights or other injury.

*Id.* at 434 U.S. at 562, 98 S.Ct. at 860; *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Thus under the *Procunier* standard, immunity was available only if the federal official had neither violated clearly established law, nor acted out of malice. *Procunier*, 434 U.S. at 562, 98 S.Ct. at 860.

The subjective element required a showing that the official took the action in "good faith" without an intention to cause injury, however, the Court soon recognized that the good faith requirement often defeated summary judgment. As questions of subjective intent "are rarely amenable to resolution on motions for summary judgment; the broad-ranging discovery which resulted could often be disruptive of effective government." *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The *Harlow* Court observed that the denial of immunity subjected government officials to harassing civil litigation.

It [is] not difficult for an ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and the decisionmaker's thought processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient to force a trial. The effect of this development upon the willingness of individuals to serve their country is obvious."

*Harlow*, 457 U.S. at 817 and n. 29, 102 S.Ct. at 2738 and n. 29.

Prompted by the "desire that judges could quickly weed out frivolous claims through firm application of the Federal Rules Civil Procedure", the *Harlow* Court made an adjustment of the former qualified immunity standard by severing the subjective element of the defense. *Harlow*, 457 U.S. at 817–18, 102 S.Ct. at 2738–39; *Zwiebon v. Mitchell*, 720 F.2d 162, 168 (D.C.Cir. 1983).

Under the current *Harlow* standard, it is well-established law that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*:

The previously recognized subjective aspect of qualified or good faith immunity ... frequently has proved incompatible with the principle that insubstantial claims should not proceed to trial. Now,

however, once the trial judge determines that the law was not clearly established at the time that the contested conduct occurred; *the inquiry ceases. At that point the official is entitled to summary judgment as a matter of law,* and [u]ntil this threshold immunity question is resolved, discovery should not be allowed.

*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2739 (emphasis added).

■ Moreover, the *Harlow* Court emphasized that officials could not be expected to predict the future of constitutional law. The defendant official's conduct was to be measured against not simply currently applicable law, but the clarity of the law at the time that the acts complained of occurred:

If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful ...

*Gray v. Bell,* 712 F.2d 490, 496 and n. 8 (D.C.Cir.1983).

b) *Application of the Current Standard*

■ This Court's task is to measure the defendants' conduct by reference to the clearly established law at the time that the challenged conduct occurred. An assessment of the state of the law at that time reveals that in the context of this action, there was no clearly established constitutional right to additional notice and opportunity to be heard before the CSA general counsel issued a final decision and communicated the decision to third parties.

Any "clearly established" potential due process entitlement in the instant context, stems from a court of appeals decision rendered more than two years after the preparation of the March 9 Memorandum, and after the September 30, 1978 conclusion of the CSA's grantor relationship. The action was brought by a dairy products supplier, who was denied substantial government contracts based upon a government con-

tracting agency officer's determination that the supplier "lacked integrity and responsibility." *Old Dominion Dairy Products v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980). The court held that the supplier *may have* had a right to receive notice of the charges against its integrity before the government denied multiple contracts on that basis. *Id.* The *Conset* court of appeals relied upon *Old Dominion* in their decision to reverse and remand the instant action. Therefore, there could not have been any "clearly established" constitutional right, applicable to the Conset plaintiff, two years *before* the 1981 decision which established that right.

The language of *Wood v. Strickland,* speaks of settled "indisputable law" and "unquestioned rights." *Wood,* 420 U.S. at 321, 95 S.Ct. at 1000. It follows that the procedural history of *Old Dominion* also demonstrates that an implication of due process rights, in the context of the plaintiff's situation, was not clearly established until the 1981 court of appeals' decision. The district court initially rejected the plaintiff's claim of due process entitlement, and entered judgment for the government. *Old Dominion v. Brown,* 471 F.Supp. 300 (D.D.C.1979). The court of appeals reversed and remanded; holding that the plaintiffs *may have* been entitled to some due process protection. *Old Dominion,* 631 F.2d at 953. Since the district court itself did not initially find that the plaintiffs were entitled to due process protection, the CSA government officials in the instant action, could hardly be expected to be cognizant of potential rights which the district court did not recognize as declared or established.

A more recent authority in this circuit is consistent with the Court's position. Seeking damages for violation of his constitutional (Fourth Amendment) and statutory rights, a plaintiff brought an action against a former Attorney General who had authorized some warrantless wiretaps. *Zwiebon v. Mitchell,* 720 F.2d 162 (D.C.Cir.1983). The court held that the former Attorney General could claim immunity from liabili-

ty, because "at the time that the wiretaps were authorized ... the Supreme Court had offered no pronouncement on the legality of the warrantless wiretaps." *Id.* at 169. The court explained that notwithstanding the evidence of memoranda and advice to the contrary from some of his advisors; "the defendant did not actually know that his conduct was illegal, and the memoranda could not otherwise support an inference that his belief was objectively unreasonable." *Id.* at 171 and n. 16. Expounding on the objective standard, the court added that the defendant, even though an Attorney General, could not be expected to evaluate, assimilate, and apply isolated lower court decisions which may have provided guidance on the impropriety of the wiretaps. *Id.* at 171 and n. 17. The court determined that defendant Mitchell had "entertained a reasonable belief in the legality of his conduct." *Id.* at 171.

Similarly, in the instant action, as previously outlined, the Court finds that at the time of the challenged conduct there existed no clearly established constitutional right to be a party to the later discussions of the General Counsel's Memorandum. As the defendants readily point out, the court of appeals found that the Conset plaintiffs were accorded some opportunity to comment (until December 20, 1977)[6]. So the question here is really *how much* opportunity to respond were the plaintiffs entitled. There were no regulations, or internal agency procedures establishing entitlement to notice or opportunity to comment before the initiation of a General Counsels' decision or subsequent to its circulation. As the Court finds that it would be unreasonable to expect a reasonable person to know of rights which the district court itself did not recognize; the defendants are entitled to qualified immunity as a matter of law.

### III

■ The United States is protected from unconsented suit under the ancient com-

mon law doctrine of sovereign immunity. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Congress enacted the Federal Tort Claims Act (FTCA) as a broad consent to suits for personal injury or death caused by the tortious actions of government employees acting within the scope of their employment under circumstances where a private person could be held liable. 28 U.S.C. § 1346 (1964).

Balanced against the interest in facilitating private redress, however, was a concern of protecting against unwarranted judicial intrusion into areas of governmental operations and policymaking. *Gray v. Bell,* 712 F.2d 490, 506 (D.C.Cir.1983); 28 U.S.C. §§ 2671 *et seq.* Thus, Congress retained a sovereign immunity exception for:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government whether or not the discretion involved is abused. 28 U.S.C. § 2680(a).

The defendants argue that their challenged conduct falls within the scope of the discretionary function exception to the FTCA. Plaintiffs maintain that neither the government officials' evaluation and determination (that the current NDWP/Conset arrangement created a potential conflict of interest which was no longer compatible with the purposes, goals and policy of the Agency), nor the officials' decision that no further discussions or negotiations were required before their subsequent preparation and issuance of a General Counsel's Memorandum; constituted the exercise of a protected discretionary function. The

---

**6.** The undisputed facts reveal that Conset knew of and had various opportunities to respond to the conflict of interest charges raised by the CSA between August and December 1977, conse-

quently, up until December 20, 1977 by which date the parties had negotiated a set of condition ... Conset had received ample due process. *Conset Corp.,* 655 F.2d at 1296–97.

Court finds that the action against the United States is barred by the discretionary function exception to the Federal Tort Claims Act.

The task of distinguishing between discretionary and ministerial duties is not an easy one. Courts have noted that "the obscurity in this area is matched only by a wealth of conclusory analytical labels, and wading through the relevant case law is surprisingly difficult." *Gray,* 712 F.2d at 507. In addition, "strict adherence to the phrase 'discretionary function' leads to blind alleys, as the language of the clause discloses virtually nothing about the scope of the protection". *Id.* at 508.

*Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) is the leading authority on the discretionary function question. In *Dalehite,* family members sought damages from the government for the death of their father during a catastrophic nitrate plant explosion. The Court held that the government employees' participation in the planning, manufacturing, adoption, supervision and maintenance of the nitrate fertilizer export program, preceding the Texas explosion, fell within the discretionary function exception, and therefore, barred suit against the United States. *Id.* 346 U.S. at 44, 73 S.Ct. at 972.

The *Dalehite* Court did not attempt to articulate a precise definition for the boundaries of the concept of discretion; but established a general distinction between planning or policymaking activities as opposed to operational or routine matters:

> *It is unnecessary to define, apart from this case, precisely where discretion ends.* It is enough to hold, as we do, that the discretionary function or duty that cannot form a basis for a suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establish-

ing plans, specifications or schedules of operations. *Where there is room for policy judgment and decision, there is discretion.* It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."

*Id.* 73 S.Ct. at 968 (emphasis added).

The task of fully expounding the meaning of the discretionary function clause was left to the lower federal courts. The exception has traditionally been applied where "relatively high level choices" were made or where the government officials and decisionmakers "undoubtedly considered a number of policy factors in arriving at their decision." *Melton v. United States,* 488 F.Supp. 1066, 1072 (D.D.C. 1980). Early applications of the clause, utilized the *Dalehite* planning/operational distinction. Courts made distinctions between discretionary decisions involving deliberate judgment (which depended upon considerations affecting the public health and interest, or the practicability of government programs) as contrasted with mere ministerial duties (which involved implementational or operational conduct according to clearly established rules and regulations). "The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Swanson v. United States,* 229 F.Supp. 217, 220 (N.D.Cal.1964). More recent decisions have dispensed with a strict application of the operational/planning distinction. In its place has gradually emerged a "functional approach which focuses on the nature and quality of the discretion involved in the challenged conduct." *Gray,* 712 F.2d at 513.

A review of the relevant case law underscores the lack of a concise, coherent standard.[7] In light of the imprecision, it is

---

7. Where decision to activate a military base was made on the planning level, but the directive authorizing the terms of its construction were very general ... the government's negligence in connection with the construction of the draining ditch and sewage disposal system occurred at the operational level. *United States v. Hunsucker,* 314 F.2d 98 (9th Cir.1962). In disregard-

helpful to look to the purpose of the exception. A principal theme of the exception is "that consistent with the related doctrine of official immunity, courts should not subject the sovereign to liability where doing so would inhibit vigorous decisionmaking by government decisionmakers." *Gray,* 712 F.2d at 511. Section 2680(a) was meant to preclude those claims arising out of certain acts of discretion. Policy decisions of administrative officials within the purview of their responsibility are simply not actionable under the FTCA.

In the instant action, the government officials' decisions were made after the evaluation of numerous factors, consideration of the plaintiffs' correspondence, and much deliberation. No CSA regulations, or clearly established law, indicated what, if any, or how much opportunity to comment should be accorded to the agency's prospective contractors. Moreover, the CSA officials were not at all constrained in their determinations by strict regulations or rules; a waiver provision in the CSA guidelines provided that even the corporations which did not meet the general CSA standards could be accorded a "special approval." The general counsels' decision that Mr. Zimmerman's dual status continued to create a potential conflict of interest which was not compatible with the agency's guidelines and goals, seems "exactly the type of discretionary function or duty, which even if abused, Congress sought to place beyond the pale of judicial scrutiny and second-guessing by the courts in tort litigation." *Dalehite,* 346 U.S. at 27, 73 S.Ct. at 963. To hold otherwise might seriously chill effective government decisionmaking.

Two recent decisions in this circuit, provide additional guidance. In *Biscoe v. Arlington County,* 738 F.2d 1352 (D.C.Cir. 1984), the court characterized discretionary functions as:

> certain decisions of the government for which there is no reason to believe that a jury would render a sounder decision than those officials chosen, qualified, and prepared to make them. It is these that are labeled discretionary, and which constitute policy decisions deemed immune from suit because there [was] no legal standard by which a judge or jury could gauge their arbitrariness or lack thereof.

*Id.* at 1352.

Reiterating the general proposition that a police department's decision to hire a specific individual is discretionary, but the acts of training, supervising, instructing and controlling the employee are "ministerial;" the *Biscoe* court warned however,

ing some factors specified by agency regulations, there was a violation of a nondiscretionary command, placing the actions of officials outside of the discretionary function exception. *Griffin v. United States,* 500 F.2d 1059, 1066–68 (3d Cir.1974). Once the government decided to build a drainage ditch in furtherance of the construction of an aircraft maintenance facility, it was no longer exercising a discretionary function when it negligently designed the drainage system although the negligent decision was made in the planning stage by the engineers preparing plans and designs ... government decisions concerning designs, plans and specifications are not within the discretionary function exception. *Seaboard Coast Line Railroad Company v. United States,* 473 F.2d 714 (5th Cir.1973). The Coast Guard's failure to adopt a comprehensive program to protect the public from decertified (unsafe) vessels fell within the discretionary function exception. *Gercey v. United States,* 540 F.2d 536 (1st Cir.1976). Negligence of government employees, in the regis-

tration for interstate sale, and approval of the faulty labeling of a poisionous fungicide, fell within the discretionary function exception, even though the Dept. of Agriculture employees failed to marshall and submit facts to the Secretary for a decision as to its possible cancellation or suspension. *First National Bank of Albuquerque v. United States,* 552 F.2d 370 (10th Cir. 1977). Government officials' negligence in failing to adequately supervise the work of an engineer who was in charge of the design and installation of the modification of the elevator system on an aircraft constituted activity at the operational level, even though such conduct was required for the execution of a planning level decision. *Swanson v. United States,* 229 F.Supp. 217 (N.D.Cal.1964). Negligent selection of a contractor to rehabilitate real property and negligent supervision of rehabilitation project after it was started did not fall within the discretionary function exception. *Melton v. United States,* 488 F.Supp. 1066 (D.D.C.1980).

that some actions include *both* discretionary and ministerial actions. *Id.* at 1363.

> Of course, not all actions having to do with training ... and supervision are necessarily operational or ministerial—training and supervision have both ministerial and discretionary components.

*Id.* citing *Carter v. Carlson*, 447 F.2d 358, 363–64 (D.C.Cir. 1971), *rev'd in part on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). Since the official's decisions were prompted by policy considerations for which no precise statute or regulation was applicable, the court held that "the official's decision should be removed from the court's jurisdiction."

The *Gray* holding emphasizes that there is not always a bright line distinction between discretionary and ministerial acts. *Gray v. Bell*, 712 F.2d 490 (D.C.Cir.1983). The *Gray* court held that a plaintiff's FTCA claim had been properly dismissed insofar as it incorporated a malicious prosecution claim and thus, challenged an actual decision to institute prosecution. The court concluded that, "prosecutorial decisions as to whether, when, and against whom to initiate prosecution ... are quintessential examples of governmental discretion in enforcing the law."

The court next addressed the defendant's alleged violations under the Grand Jury and Due Process clauses of the Fifth Amendment.[8] The court found that "the improper tortious actions allegedly undertaken [were] to *intertwined* with purely discretionary decision ... to be sufficiently separated from the initial decision to prosecute." *Id.* at 516. Each allegation of improper investigator conduct was "inextricably tied" to the decision to prosecute and to present evidence to the grand jury:

> Even though prosecutorial misdeeds in investigating and presenting evidence could be viewed as nondiscretionary ... the conduct as alleged in this case is *insufficiently* separable from the discre-

tionary decision to initiate prosecution, and therefore cannot itself support suit under the FTCA.

*Id.* (emphasis added).

Under a similar rationale, the Fifth Circuit recently held that certain ministerial duties were inseparable from discretionary functions. *Payton v. United States*, 679 F.2d 475 (5th Cir. Unit B 1982) (en banc). In *Payton*, the plaintiff had initiated a wrongful death action against federal parole authorities for a murder perpetrated by a psychotic federal parolee. In anticipation that the parole release determination would be characterized as a discretionary function; the plaintiff drew his complaint—as the *Gray* plaintiff had—in a fragmentary fashion, challenging the Parole Board's "ministerial" failure to acquire and examine certain records before making the parole decision. The court nevertheless dismissed *all* of the allegations, explaining that the plaintiff's challenge to the "ministerial" omissions implicated the discretionary function of the Board. "To withstand a motion to dismiss, an allegation challenging the Board's performance of any ministerial act would have to be *sufficiently distinguishable* from a complaint disputing the Board's exercise of its discretionary function." *Id.* The plaintiff would therefore have to allege that the Board breached a duty sufficiently separable from the decisionmaking function to be non-discretionary and outside the scope of the exception. *Id.* at 482.

Applying the same rationale to the instant action, the challenged conduct was not sufficiently separable from the officials' discretionary functions to be placed outside the scope of the exception. The *Gray* court illustrated that courts will not permit a suit for damages occasioned by activities that are not meaningfully separate from the underlying, protected, undisputably discretionary functions. *Gray*, 712

---

**8.** The court held that intentional torts could also fit within the discretionary function exception. *Gray*, 712 F.2d at 507. In the instant action,

plaintiffs have alleged an intentional tort. (*See* paragraph 34 of Second Amended Complaint.)

F.2d at 516. Plaintiffs themselves, admit that the decision to approve or deny contract arrangements was a discretionary duty of the defendant officials. The general counsel and high level officials possessed specialized knowledge and experience for making such decisions. Obviously, their final decision that no future contracts should be approved and that the potential conflict still existed, of necessity, required a determination of when to prepare and release that final decision. Thus, the Court holds that section 2680(a) exempts the government from liability for exercising the discretion inherent in its decision to terminate the contract arrangement and its subsequent decision that no further discussions, negotiations, or communications from plaintiffs were necessary before rendering and preparing the General Counsels' memorandum and circulating the charges.

## IV

Plaintiffs' blanket assertion of First Amendment violations is dismissed for failure to state a cognizable claim. Plaintiffs have failed to allege the manner in which they were prevented from access to the Court and why they could not petition through the appropriate government channels. Moreover, plaintiffs have not cited a single authority in support of this allegation.

Plaintiffs' allegations of conspiracy and gross abuse of discretion are also barred by the doctrine of qualified immunity which protects government officials who, as in the instant action, are acting within their scope of employment.

As the individual defendants are entitled to qualified immunity for their actions, and the claims against the United States are barred by the discretionary function exception; the plaintiffs can prove no set of facts that would entitle them to relief. This Court is without jurisdiction.

Accordingly, this action is dismissed.

An appropriate Order has been entered.